THE ASSOCIATION FOR THE BENEFIT OF COLORED ORPHANS IN THE CITY OF NEW YORK, Appellant and Respondent, *v.* THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, Appellant and Respondent.

The object of plaintiff's incorporation, as expressed in its constitution, made pursuant to its charter (Chap. 232, Laws of 1838), is "to provide and maintain a place of refuge for colored orphans where they shall be boarded and suitably educated." Plaintiff purchased certain real estate in the city of New York, which with the buildings thereon are used for the purpose of its incorporation. By the "House Rules" religious services are required to be held once a day each Sunday and on certain other days specified, but no visitors are allowed to be admitted on Sunday except under pressing circumstances, and with the consent of the superintendent. In an action to have certain taxes imposed upon the land declared void; *held,* that the building upon the land in question was not a "school house," "an incorporated academy or other seminary of learning," or a "building for public worship," within the meaning of the provision of the Revised Statutes in reference to exemptions from taxation (1 R. S. 388, § 4, subd. 3), at least as limited by the provisions of the statute in relation to such exemption in the city of New York (Chap. 282, Laws of 1852; § 827, chap. 410, Laws of 1882), but that it was an "alms-house" within said provision of the Revised Statutes (§ 4, subd. 4, as amended by chap. 136, Laws of 1866), and as such it and the land were exempt from taxation.

Plaintiff took title to the premises by deed dated July 31, 1877; *held,* that as by the general scheme of taxation applicable to said city (now incorporated in chap. 410, Laws of 1882, §§ 814 *et seq.*), the character of real estate for the purposes of taxation is fixed for the year on May 1, and if then assessable it remains so, and there is no power lodged anywhere to take it out of the record book or the roll for that year, the tax was properly laid, and was payable by the plaintiff if it desired to clear its title; and this, without regard to the question as to whether the tax had become a lien when plaintiff took title.

(Argued February 9, 1887 ; decided March 1, 1887.)

THESE were cross appeals from a judgment of the General Term of the Supreme Court, in the first judicial department, entered upon an order made January 8, 1886, which affirmed in part and reversed in part a judgment in favor of plaintiff, entered upon a decision of the court on trial at Special Term. (Reported below 38 Hun, 593.)

The nature of the action, and the material facts, are set forth in the opinion.

*Herbert A. Shipman* for plaintiff. Aside from the religious instruction the giving of which is shown to be an important branch of the business of plaintiff, it is certainly a religious association within the meaning of the statute. (*Hebrew Free School* v. *Mayor, etc.*, 4 Hun, 446.) But even if this association was not a religious association, its property would still be exempt from taxation, for the reason that it is a public incorporated institution of learning. (*Chegaray* v. *Mayor, etc.*, 13 N. Y. 220; *People ex rel. N. Y. Med. Coll. and Hosp'l for Women* v. *Campbell*, 93 N. Y. 198.) The buildings of this association come within the terms of the definition of an alms-house. (*Hebrew Orph. Asylum* v. *Mayor, etc.*, 11 Hun, 118.) No lien or incumbrance is created by tax until after the list containing it is confirmed. (*M. E. Church* v. *Mayor, etc.*, 20 Hun, 298; *Barlow* v. *St. Nich. Nat. Bk.*, 63 N. Y. 399; *Fisher* v. *Mayor, etc.*, 67 id. 77.)

*Arthur H. Masten* for defendant. The property of orphan asylums is not exempt from taxation under the laws of this State. (1 R. S. [7th ed.] 982; Laws of 1883, chap. 397, § 4; Laws of 1863, chap. 132; Laws of 1866, chap. 647; id. chap. 350; Laws of 1867, chap. 122; Laws of 1868, chaps. 258, 468; Laws of 1871, chaps. 81, 249; Sedgw. on Stat. Constr. [2d ed.] 212; Maxw. on Interp. of Stat. 40; *People ex rel. West. Fire Ins. Co.* v. *Davenport*, 91 N. Y. 574, 592.) The fact that the religious exercises or services held in plaintiff's building are for the exclusive benefit and enjoyment of the inmates of the institution, is sufficient to show that the premises are not to be regarded as a " place of public worship," within the meaning of the statute. (*Rector, etc.* v. *Mayor, etc.*, 10 How. Pr. 138; *Bangor* v. *Masonic Lodge*, 73 Me. 428.) The property of the plaintiff is not exempt as an " alms-house." (Laws of 1867, chap. 951; Laws of 1870, chap. 424; Laws of 1873, chap. 661; Laws of 1875, chap. 140; Laws of 1878, chap. 401; Laws of 1881, chap.

323.)  The settled rules of statutory construction forbid such an interpretation as is required to include the property of the plaintiff within the classes that are exempt from taxation. (*Chegaray* v. *Mayor, etc.*, 13 N. Y. 220 ; *N. Y. Med. Coll. & Hosp. for Women* v. *Campbell*, 93 N. Y. 196 ; *Buffalo City Cem.* v. *City of Buffalo*, 46 id. 506 ; *Roosevelt Hospital* v. *Mayor, etc.*, 84 N. Y. 108 ; *People ex rel. Westchester Fire Ins. Co.* v. *Davenport*, 91 N. Y. 574, 586 ; *People ex rel. Twenty-third St. R. R. Co.* v. *Tax Com'rs*, 554, 556, 557.)  The property in question was in no event exempt from taxation for the year 1877, because it was not purchased by the plaintiff until July 31, 1877, after the books of annual record had been closed, and the right to claim exemption for that year was gone. (*Clark* v. *Norton*, 49 N. Y. 243 ; *Overing* v. *Foote*, 65 id. 264 ; *People ex rel. Twenty-third St. R. R. Co.* v. *Com'rs of Taxes*, 91 id. 593, 602 ; *McMahon* v. *Beekman*, 65 How. Pr. 427, 433.)

Peckham, J.  The plaintiff commenced this action to set aside as a cloud upon its title the lien of certain taxes which the taxing officers of defendant had assumed to levy upon its lands situated in that city and exclusively used by it for the purposes of its incorporation.  The taxes were levied from the years 1877 to 1880, both inclusive, and amounted to something over $2,000.  The Special Term granted judgment in favor of the plaintiff and enjoined the collection of the tax for any one of the years mentioned.

Upon appeal to the General Term that court affirmed the judgment as to all the years but 1877, and held that the plaintiff purchased its land in that year subject to the lien of the tax and therefore modified the judgment of the Special Term as to that year.  Both parties appealed from that order, and the whole question is now before this court for review.  The plaintiff claims that its property is exempt from taxation by virtue of the general laws of the State.  The court below placed its decision on two grounds, first that the facts showed that the building in question upon the property of the plain-

tiff was a school-house, and second that it was a building for public worship.

The plaintiff was incorporated as a colored orphan asylum by chapter 232 of the laws of 1838. Its charter was subsequently amended, but not in any matter material to this investigation. The act of incorporation did not specify the purpose for which the corporation was formed any further than such purpose might be assumed from the name, but it did make the corporation subject to the provisions of and it gave to it the powers possessed by a corporation under the Revised Statutes (1 R. S. 600, § 1), and the sixth subdivision of that section gave the corporation power to make by-laws for the regulation of its affairs.

There was put in evidence on the trial a copy of the constitution of the plaintiff made pursuant to this power to make by-laws, and by article two it was declared that "the object of this society shall be to provide and maintain a place of refuge for colored orphans where they shall be boarded and suitably educated until of an age to be bound or apprenticed. In admitting children to the asylum those deprived of both parents shall have the preference, but if means be afforded, half orphans shall be received."

Judging from its act of incorporation and the provisions of its constitution we are by no means satisfied that it comes under either head of exemption as stated by the court below. This court has decided that the "school house" referred to in our statute of exemption (1 R. S. 388, § 4, sub. 3), is the public common school. (*Chegaray* v. *Mayor, etc.*, 13 N. Y. 220.) The dictum of RUGGLES, Ch., J., to the contrary, in *Chegaray* v. *Jenkins* (5 N. Y 376), being overruled by the court. It is difficult to see also how this can be said to be a building for public worship within the same statute.

The house rules provide that the Sabbath religious services shall be held in the assembly room at eleven A. M., * * * and appropriate services on Thanksgiving and national fasts at such hour as the superintendent may designate. But it is also expressly provided that "no visitors are to be

admitted on that day (Sunday), either to the children or other inmates, except under pressing and peculiar circumstances and by consent of the superintendent or matron."

How can that worship be called public to which the public is not admitted? On the contrary, it is obviously conducted as a proper religious service for the inmates of the institution only, and who are by statute made the wards of the trustees, who are thereby constituted their guardians.

Again, by the act (chap. 282, Laws of 1852), repeated substantially in section 827 of chapter 410, of the Laws of 1882 (New York consolidation act), the building for public worship to be exempt must, in New York city at least, be exclusively used for that purpose and also be the property of a religious society. It is not pretended that it is thus exclusively used. Nor can it be successfully contended that the plaintiff is brought within the meaning of the statute as being either " an incorporated academy or other seminary of learning" by the very limited provision that is made for suitably educating these orphan children until they are of an age to be bound out or apprenticed. At any rate the building is not exclu- sively used for the purpose of a seminary of learning; nor is that its prime or chief purpose. Protection and care, a place of refuge for colored orphans, are the main purposes, and the comparatively small amount of education comes in as an addendum to such charity.

The case of *Hebrew Free School Association* v. *Mayor, etc.* (4 Hun, 446), is not in point. In that case there was and could be no question but that the corporation was a seminary of learning within the general exemption statute, and the only issue raised was whether the building was the exclusive property of a religious society. The object of the corpora- tion was to provide for the gratuitous instruction of Jewish youth in the Hebrew religion and language and other branches of knowledge and promote the study of Hebrew literature. The court held it answered sufficiently the designation of a religious society within the meaning of the act of 1852 to entitle its building to exemption. But in this case the plaintiff is not

brought within the general statute of exemption upon any of the grounds already discussed.

We think, however, its claim can very fairly rest upon another subdivision of the same statute. By subdivision 4 of section 4, already cited (as amended by chap. 136, of the Laws of 1866), it is provided that "every poor-house, alms-house, house of industry and every house belonging to a company incorporated for the reformation of offenders, or to improve the moral condition of seamen and the real and personal property used for such purposes belonging to or connected with the same," shall be exempt from taxation. At first it might be thought (and it has been claimed), that this statute refers to such alms-houses as are the property of the public and are used and controlled by public authorities as the receptacles of public paupers in accordance with the general system of the poor laws of our State. This kind of claim was made in the case of the *Swiss Benevolent Society* in the precise language above used, and in that case, reported in the Daily Register, September 12, 1885, the New York General Term held that the argument was not sound, and for reasons which we think are entirely valid.

In the first place it may be observed that there is no occasion for so narrow a construction of the statute arising from the language used. The statute in terms includes property other than such as is owned by the public, as it includes any corporation incorporated for the reformation of offenders, or to improve the moral condition of seamen, both of which may be private corporations, and so, too, an alms-house may be a private corporation. The building of the plaintiff comes within the fair meaning of an alms-house which is defined as a house appropriated for the poor. This, certainly, is the case with the building of the plaintiff. It is appropriated wholly for the poor who are colored orphans, and where they are to have a place of refuge and to be boarded, clothed and suitably educated, etc., gratuitously. What seems a still stronger reason for denying the correctness of the claim that the statute refers only to the well known public

alms-houses is the fact that in treating of the general subject of the support of the poor, the legislature (1 R. S. 614), by a special section (p. 631, § 72), made this provision for the public alms-houses just spoken of :  " Every poor-house, alms-house, or other place provided by any city, town or county for the reception and support of the poor, and all real and personal property whatever, belonging to or connected with the same, shall be exempt from all assessment and taxation," etc.   This is simply a substantial repetition of the act of 1826, chapter 10, which made it unlawful " to assess any city, county or town  poor-house or alms-house," and, like that act, it strictly confines the exemption to public alms-houses and would, therefore, exclude a building devoted to such purposes as that owned by the plaintiff.   But when the general statute relating to exemptions is passed as part of the Revised Statutes, it is seen how much broader the language is than was used in the act of 1826.   In providing for the general support of the poor, a subsequent part of the Revised Statutes re-enacts (as above quoted) the substance of the act of 1826, with additions as to the keeper of such poor-houses.   It may be thought that this subsequent enactment was unnecessary because the public alms-houses were certainly included in the general exemption statute.   However that may be, it does not detract from the strength of the argument that when the legislature first passed an enactment regarding alms-houses it did so in such language as included only public institutions, and when it passed in the Revised Statutes a general enactment as to exemptions it adopted language showing an intention to greatly broaden the exemption.   If its intentions had been the same in the passage of the two provisions embodied in the Revised Statutes and already quoted, it is not too much to say that it would have adopted the same language, or language of like import, and in regard to which there would be no room for doubt or misapprehension.   The general principle that statutes of exemption should be strictly construed, we believe in and adhere to, but such a case as this we do not regard as coming within that principle.   The

plaintiff is performing a work of pure charity and is taking upon its own shoulders a portion of the burden that would otherwise fall upon the public. It is doing this good work by the express permission of the legislature, and through its aid, by reason of its incorporation, and in the language of Mr. Justice Davis, in the case of *The Swiss Benevolent Society*, above cited, the legislature "cannot intend to tax the means by which the relator performs the duty" for which it was incorporated, "that of taking a portion of a public burden upon its own shoulders."

Such a case as this is wholly outside of the mischief intended to be prevented by the rule referred to. When business corporations or interests come to the courts seeking an exemption from the common burden of taxation, it behooves them to show plainly the law which grants the exemption claimed, and the courts will scrutinize it with great care and caution before allowing such claim.

We think the property comes fairly within the meaning of the statute as an alms-house, and that it was exempt on that ground from taxation.

The remaining question relates to the tax of the year 1877, which the General Term held the plaintiff liable to pay. The plaintiff took title to the premises by deed dated July 31, 1877, and it is now contended that there was no lien arising from the imposition of any tax until the amount of the tax was carried out and the same was confirmed, which in this instance did not, as is said, take place until October, 1877.

In questions arising under covenants in deeds as to incumbrances, it has been decided that no lien or incumbrance by reason of a tax existed until the amount thereof was ascertained or determined. (*Dowdney* v. *Mayor, etc*, 54 N. Y. 186.)

A different principal, however, is here involved. The counsel for plaintiff says, that when the assessors valued the property in question for the purpose of taxation, it was legally liable to taxation, and the action of the commissioners in assessing it was undoubtedly correct, but he claims that the

tax was illegally confirmed, as at that date it belonged to plaintiff and was exempt. We do not think this is the case.

The court at Special Term found that in 1877 a tax of $524.70 was levied on the premises in question by the defendant. This tax arose from the tax proceedings which were initiated in September of the year 1876. By section 814, and following sections of the consolidation act of New York (Chap. 410, Laws of 1882), the deputy tax commissioners commenced to assess real and personal estate on the first Monday of September in each year. They furnish to the commissioners of taxes and assessments, under oath, a detailed statement of all the taxable property in their several districts. From these returns the commissioners make up certain books called "the annual record of the assessed valuation of real and personal estate." These books are open for examination and correction from the second Monday in January until the first day of May in each year, on which last named day they are closed to enable the commissioners to prepare assessment-rolls of the several wards for delivery to the aldermen.

On the first day of May the commissioners must cause to be prepared from these books of annual record, and which are declared by law to be closed on that day, assessment-rolls for each ward, and must annex to them a certificate that the same are correct, in accordance with the entries in said books of record. These rolls, thus certified, must be delivered by the commissioners to the board of aldermen on the first Monday in July in each year. These rolls are then taken by the board which, after examination and figuring, carries out the amount of the tax, having in the meantime arrived at the determination of the gross amount to be raised by taxation for the year, and the assessment-rolls must be delivered, with the proper warrants from the board of aldermen attached, to the receiver of taxes on or before the first day of September, who then gives notice and proceeds to collect the taxes.

From this review of the law it is seen that the initial steps to levy a tax commence in September of one year and are not

concluded by the receipt of the tax warrants by the receiver of taxes until the September following, covering a whole year in the process. Even if real estate not on the annual record of assessed valuation at the time when the books are open for examination could be placed on, or if real estate that is on could be taken from the record up to the time of the closing thereof in the following May, it is clear that no such alteration could be made after that date, and it is equally clear that the general scheme of taxation is to enter as assessable that property which is of that character up to the time when the record book is open for examination. If then assessable, its character would seem to be fixed for the year, but in any event, if assessable and assessed at the time the books close it must remain so for purposes of taxation under the assessment-roll that is to be compiled from the record for that year. There is no power anywhere after that to take real estate out of that record and out of the roll, because since the closing of the record the property has passed into the hands of an institution exempt from taxation. The exemption must be held in such a case as this to be prospective in its operation. There is no provision made for any amendment or alteration of the record after the first day of May in regard to the assessment of property (with an exception that does not touch this case, § 820), and all subsequent proceedings are based upon the absolute stability of the record from that date, and the assessment-rolls are to be correct and certified transcripts of the same. Upon this basis the taxes are carried out by the aldermen and the rolls with the proper warrants annexed are delivered to the receiver of taxes, and thus at no period of time intermediate the closing of the books on the first of May and the reception of the assessment-rolls and the warrants annexed thereto by the receiver, could any one legally drop this property from the assessment-roll. Whether or not the tax had become a lien at the time when the plaintiff took title is a fact of no moment. It may be conceded that technically there was then no lien. For the reasons already given the property was nevertheless rightly on the roll and could not be legally

taken off, and the tax was properly laid and was payable by the plaintiff if it desired to clear its title to the property.

The judgment of the General Term, modifying the judgment of the Special Term, should be affirmed, and as both parties appealed from it and both have failed, neither should recover costs as against the other.

All concur.

Judgment affirmed.