[Civil No. 1456.   Filed July 1, 1916.]

[158 Pac. 837.]

BOARD OF CONTROL OF THE STATE OF ARIZONA
and CHARLES P. OSBURN, Secretary of the Board of
Control of the State of Arizona, Appellants, v. L. H.
BUCKSTEGGE, Appellee.

1. ASYLUMS — PUBLIC AND PRIVATE — "ALMSHOUSE." — An "almshouse" may be a public institution kept up by public revenues, or it may be an institution maintained by private endowment and contributions, where the indigent sick and poor are cared for without cost to themselves.

2. INFANTS—MOTHERS' PENSIONS—CONSTITUTIONAL PROVISIONS.—Initiated Act Nov. 3, 1914 (Acts 1915, Initiative Measures, p. 10), providing for old age and mothers' pensions, if its language abolishing almshouses be construed to include state institutions, would violate Constitution, article 22, section 15, providing for establishment and support by the state of reformatory and penal institutions and institutions for the benefit of the insane, blind, deaf and mute, and other institutions required by the public good.

3. COUNTIES—OFFICERS—POWERS DELEGATED.—County supervisors can exercise no powers except those specifically granted by statute and in the manner fixed by statute.

4. MUNICIPAL CORPORATIONS—POWERS—MODE OF EXERCISE OF POWERS. Where the method of exercising powers conferred by statute upon municipal corporations is by statute specifically prescribed, the method is jurisdictional.

5. INFANTS—STATUTORY PROVISIONS—MOTHERS' AND OLD AGE PENSIONS. Under Act Nov. 1914, providing for old age and mothers' pensions, abolishing almshouses in the state and establishing such pension system "in the absence of almshouses," the system does not take effect until after the abolishment of all almshouses.

6. STATUTES — TITLES — SUBJECT NOT EMBRACED IN TITLE.—Such act, being entitled, "An act providing for an old age and mothers' pension and making appropriation therefor," violates Constitution, article 4, section 13, providing that the subject of an act shall be expressed in the title, since it provides, not only for the establishment of old age and mothers' pensions, but also covers the abolishment of the statutory system of county hospitals and poor farms, leaving the different counties without any means or provisions for the care of their indigent sick and poor, not entitled to pensions.

7. STATUTES—TITLES—SUBJECT NOT EMBRACED IN TITLE.—Constitution, article 4, section 13, requiring the subject of an act to be embraced

in its title, does not require that a title of an act should minutely and in great detail describe the legislation proposed or be a complete index to the legislation.

8. STATUTES—TITLES—SUBJECT NOT EMBRACED IN TITLE.—The title of an act should be sufficiently full and comprehensive to indicate, in a general way at least, what is to follow in the way of legislation, and should not be so meager as to tend to avert inquiry into the contents thereof.

9. STATUTES—TITLES—SUBJECT NOT EMBRACED IN TITLE.—Such constitutional provision is liberally construed.

10. INFANTS—MOTHERS' PENSION LAW—CONSTITUTIONALITY.—Initiated Act Nov. 3, 1914, providing for old age and mothers' pensions, cannot be sustained, in that it requires the support by pension of certain mothers with dependent children, regardless of their financial condition.

[As to vested right of pensioner to pension, see note in **Ann. Cas.** 1915C, 751.]

APPEAL from a judgment of the Superior Court of the County of Maricopa. Geo. H. Crosby, Judge. Affirmed.

Mr. Wiley E. Jones, Attorney General, and Mr. Leslie C. Hardy and Mr. Geo. W. Harben, Assistant Attorneys General, for Appellants.

Mr. H. M. Fennemore and Mr. Will E. Ryan, for Appellee.

ROSS, C. J.—An initiated act adopted at the November, 1914, election undertook to impose the duty upon the board of control of the state of Arizona of ordering the payment of warrants issued by the boards of supervisors of the various counties of the state in the payment of pensions to certain persons therein mentioned. The act, including the title, reads as follows:

"An act providing for an old age and mothers' pension and making appropriation therefor.

"Be it enacted by the people of the state of Arizona:

"Section 1. All almshouses within the state shall be abolished, their grounds and buildings shall be sold for the best obtainable price, and the proceeds shall be devoted for the purpose hereafter set forth in this act.

"Sec. 2. In the absence of almshouses, and in order to care for aged people and people incapable of earning a liveli-

hood by reason of physical infirmities, and widows or wives whose husbands are in penal institutions or insane asylums, they being mothers of children who are under the age of sixteen (16) years, a system of pensioning is hereby established.

"(a) The Arizona State Board of Control shall have entire charge of all funds provided for the purpose mentioned, and shall order the same paid by the state treasurer to persons entitled, upon warrants issued by the boards of supervisors of the various counties in the state of Arizona. These boards shall also act as examining boards on the fitness and eligibility of applicants for pensions.

"Sec. 3. The state shall pay to each man and woman sixty (60) years of age and upward the sum of fifteen ($15.00) dollars per month, as long as such pensioners shall continue to live within this state; provided, always, that said recipients shall be citizens of the United States and residents of Arizona for five (5) years last preceding application; to be entitled to this pension they must also be without visible means of support.

"Sec. 4. All widows who are mothers of dependent children, also wives whose husbands have been consigned to penal institutions or insane asylums and who have children under the age of sixteen (16) years looking to them for support, shall each be entitled to fifteen ($15.00) dollars per month, and an additional six ($6.00) dollars per month for each child in their keeping under the age above mentioned, irrespective of the mother's age, provided they are citizens of the United States and residents of Arizona five (5) years last past preceding application.

"Sec. 5. There is hereby appropriated out of the general fund of the state treasury a sufficient amount each year to carry out and put into effect the provisions of this act.

"Sec. 6. All acts or parts of acts in conflict with the provisions of this act are hereby repealed." Laws 1915, p. 10.

The board of supervisors of Gila county, under the provisions of this act, issued its warrant in favor of Catherine Bramham for $15 per month for herself and $6 per month each for her six children, a total of $51 per month; it being made to appear to the said board of supervisors that Catherine Bramham was a widow and the mother of six children under

the age of sixteen. Said board also allowed the claim of
Gus Wolf for $15 per month upon the showing to it that he
was upward of sixty years old and without visible means of
support. This action was brought by appellee as a resident
taxpayer to restrain the board of control from ordering the
said sums to be paid by the state treasurer, it being contended
by appellee that said act was without force or effect for
various reasons. The appellant board of control demurred
to the complaint on the ground that it failed to state facts
sufficient to constitute a cause of action, the demurrer was
overruled, and, the appellants refusing and failing to fur-
ther answer, judgment was entered, restraining the board of
control as prayed for in the complaint. From this judgment
an appeal is prosecuted.

At the outset we will say that it is not our purpose to take
up and dispose of all of the objections urged by appellee
against this act. We think it apparent that the judgment
of the lower court was correct, although we may not agree
with all of his conclusions, nor with all of the propositions
advanced by the appellee.

It will readily be seen that the purpose and intent of the
act is to introduce into the laws of Arizona a pension system
for the benefit of certain citizens and persons designated
in the act. The purpose is single and easily discernible when
the act is held up before the light of reason; no words in ex-
planation of the purpose of the lawmaker can be employed
that will make it plainer than the title of the act, "Providing
for an old age and mothers' pension and making appropria-
tion therefor." While the object of the act is easily deter-
minable from its title and context, the lack of a clear
statement of the means and methods of its enforcement, we
think, must necessarily result in its defeat. Standing alone,
it is not a complete act, and unless the existing laws supply
its defects or omissions, it is difficult to see how it may be
carried into effect.

With these observations in mind, let us look into sections
1 and 2 of the act. It is provided in section 1 that "all alms-
houses within the state shall be abolished." Various defini-
tions of almshouses are given in 2 Corpus Juris, 1160, as
follows:

"A house appropriated for the poor; a home provided for the reception or relief of poor persons; a house appropriated for the use of the poor, who are supported by the public or by a revenue derived from private endowment; a place where the poor are maintained at the public expense; an institution supported by charity, which makes no charge whatever for the benefits rendered; any institution whose inmates are supported wholly by charity."

It will be thus seen that an almshouse may be a public institution kept up by the public revenues, or it may be an institution maintained by private endowment and contributions. The central idea is that it is a house appropriated for the poor. The act fails to define almshouses, and we must assume that it is intended to have the meaning ordinarily understood by its use; that is, a house or institution where the indigent sick and poor are cared for without cost to themselves.

We have now in this state, and have had for a great many years, a statutory system for the caring and keeping of our unfortunate poor. The institutions founded under this system have commonly been known and designated as county hospitals or poor farms, the law having cast the burden and duty of looking after and caring for the poor upon the counties. Some of the counties have purchased lands and erected thereon commodious, modern and comfortable buildings in which to house and care for their poor; in others, we believe, the contract for the care and keeping of the indigent sick and poor has usually been awarded to the lowest and best bidder. It is, we apprehend, these institutions that the act was intended to abolish; it was doubtless directed at the system of poor farms and county hospitals throughout the different counties of the state. It is, however, broad enough in its language to include private institutions for the poor and state charitable institutions, but if it was intended to reach state institutions, it would be violative of the mandate contained in section 15, article 22, of the Constitution. That section provides:

"Reformatory and penal institutions, and institutions for the benefit of the insane, blind, deaf, and mute, and such other institutions as the public good may require, shall be

established and supported by the state in such manner as may be prescribed by law.''

Assuming that the almshouses proposed to be abolished were county hospitals and county poor farms and nothing else, who, in the first instance, under the act, is to determine that question? Is it the board of supervisors of the different counties, or is it the board of control? It is certainly not the board of control, for there is no general law giving this body any power over the charitable institutions of the different counties, and this act does not purport to do so. If it is the board of supervisors whose duty it is to determine, if they have any almshouses, is it also their duty to sell the same and, if so, what disposition shall they make of the purchase price received? Section 1 says:

''The grounds and buildings shall be sold for the best obtainable price, and the proceeds shall be devoted for the purpose hereinafter set forth in this act.''

Looking to the general statutes, we find that the ''board of supervisors . . . have jurisdiction and power, under such limitations and restrictions, as are prescribed by law: . . . (10) To sell at public auction at the courthouse door, after thirty days' previous notice given by publication in a newspaper of the county, and convey to the highest bidder, for cash, any property, real or personal, belonging to the county, paying the proceeds into the county treasury for the use of the county.'' Paragraph 2418, Civil Code 1913.

The board of supervisors can exercise no powers except those specifically granted by the statute and in no other way than that fixed by the statute. The law is well settled that, where the method of exercising powers conferred by statute upon municipal corporations is specifically prescribed, that method must be followed. *City of Nevada* v. *Eddy,* 123 Mo. 546, 27 S. W. 471; *Lincoln St. Ry. Co.* v. *City of Lincoln,* 61 Neb. 109, 84 N. W. 802; 2 Dillon on Municipal Corporations, §§ 571, 572; *City of Fort Scott* v. *W. G. Eads & Co.,* 117 Fed. 51, 54, 54 C. C. A. 437. And when any other method than that prescribed is followed, such acts are without jurisdiction and wholly void. *City* v. *Eads, supra.* Under the law, then, if the board of supervisors should sell a county hospital or poor farm, it would become their duty to pay ''the proceeds into the county treasury for the use of the county.'' They

must also sell at public auction to the highest bidder for cash and after thirty days' previous notice.

There is another very interesting question involved in the sale of these institutions by the different counties and paying the proceeds into the state treasury, which we do not pass upon, but advert to, and that is this: These institutions are the property of the county in which they are located. They have been bought and paid for by the citizens and taxpayers of that political subdivision. Some of the counties have poor farms and some, we have found, have none. In some of the counties they are worth large sums of money, and in others they are of little value. Now, it is true that counties are mere agents of the state, invested with certain subordinate governmental functions for reasons of convenience and public policy, and they have no vested rights in their offices, their charters, their corporate powers, or even their corporate existence, yet as long as they remain existent and are performing the functions for which they were created, it is questionable in our minds whether the state can, in one word, take from them the institutions that they have built and paid for, for the purpose of performing the duties imposed upon them by law. The burdens of government should fall equally upon all of the citizens. This equality would not be maintained unless all of the counties had almshouses to convert into money for the state treasury in aid of this pensioning act.

It was not intended that the abolishment of almshouses should be at the taking effect of the act, but upon the sale of the grounds and buildings and turning the proceeds thereof into the state treasury. This is evidenced in that the language used in section 1 is "shall be abolished," "shall be sold," and "shall be devoted," words of future potentiality. The pension system was not intended to take effect until after the abolishment of all almshouses. It is postponed until then, for in section 2 it is said: "In the absence of almshouses . . . a system of pensioning is hereby established." Before the state board of control would be authorized to order the payment of warrants issued by the boards of supervisors of the various counties in the state it must be made to appear that all almshouses within the state have been abolished, their grounds and buildings sold, and the proceeds

passed into the treasury of the state. No such showing was made, or attempted to be made, by the appellants. It was not intended by the act that the system of county hospitals and poor farms that have so long been used to care for aged people and people incapable of earning a livelihood by reason of physical infirmities should subsist, side by side, with the pension system. The latter was intended as a substitute for almshouses; and until the almshouses were actually converted into cash, and thus completely abolished as institutions for the care of the indigent sick and poor, the pensioning system, by the very terms of the act, is held in abeyance pending the transition.

It is contended by appellee that the act violates the provisions of section 13, article 4, of the Constitution. That section reads:

"Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; but if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be embraced in the title."

It is said that the legislation is very much broader than the subject expressed in the title; that the title is a notification that the purpose of the act is to create a pensioning system for old-aged persons and mothers; that the title contains no suggestion that the system of county hospitals existing in the state would be abolished, or that any existing laws would be repealed, and that, in so far as the legislation attempted to abolish almshouses and to repeal existing laws, it is unconstitutional. This section of our Constitution, or sections of similar import, are common to the Constitutions of the different states of the Union. The purpose of these constitutional provisions, it may be said generally, is to prevent surprises that were frequent in legislation prior to their adoption. There was a time when titles of acts were of little importance, and not infrequently bore no relation to the legislation that followed. *Omnibus,* hodgepodge and log-rolling legislation with all their evils were more or less prevalent. It is said:

"These provisions are intended to prevent the evils of '*omnibus* bills' and surreptitious legislation." 36 Cyc. 1017.

By confining the legislation to the subject contained in the title, neither the members of the legislature nor the people can be misled to vote for something not known to them or intended to be voted for.

This provision of the Constitution does not require that the title of an act should minutely and in great detail describe the legislation proposed; it is not necessary that the title be a synopsis or a complete index to the legislation. The title of the act, however, should be sufficiently full and comprehensive as to indicate, in a general way at least, what is to follow in the way of legislation. It should not be so meager as to mislead or tend to avert inquiry into the contents thereof. As was said by Justice CHAMPLIN in *Re Hauck,* 70 Mich. 396, 38 N. W. 269:

"In testing acts of the legislature by this clause of the Constitution, we should not, on the one hand, be so hypercritical as to require every matter of detail to be stated in the title, nor, on the other hand, so liberal as to render the constitutional provision nugatory. But regard should be had to the letter and spirit of the Constitution, the evils it was intended to prevent, the rights it was intended to preserve, and, so regarding it, to test the act which is claimed to be repugnant to this clause candidly and justly, and, if it shall appear that the constitutional provision has been disregarded, to perform the duty enjoined on us by our oath of office, and declare the act unconstitutional and void."

The requirements of this constitutional provision are liberally construed by the courts. There is no purpose to hamper or defeat or embarrass legislation by putting a strained or technical construction upon it. Black's Constitutional Law, 329. And if the courts entertain any reasonable doubt as to the validity of the law, they would sustain it. Under this provision, the title of an act plays a very important part. It is necessary because, without it, there can be no legislation. It may be made narrow and restricted, in which case the legislation must likewise be narrow and restricted, or it may be made broad and comprehensive, extending the legislation, providing it is germane to the subject mentioned in the title. As is said by Justice COOLEY on Constitutional Limitations, seventh edition, page 212:

"As the legislature may make the title to an act as restrictive as they please, it is obvious that they may sometimes so frame it as to preclude many matters being included in the act which might with entire propriety have been embraced in one enactment with the matters indicated by the title, but which must now be excluded because the title has been made unnecessarily restrictive. The courts cannot enlarge the scope of the title; they are vested with no dispensing power. The Constitution has made the title the conclusive index to the legislative intent as to what shall have operation. It is no answer to say that the title might have been made more comprehensive, if in fact the legislature have not seen fit to make it so."

Bearing in mind what we have said about the purpose and requirements of this constitutional provision and the efforts of the courts to sustain and uphold legislation when challenged as violative of its prohibitions, let us look into the act in question. The provision requires that the subject of every act shall be expressed in its title, and shall be single, and limits legislation to that subject and matters germane thereto or properly connected therewith. The subject of this act is: "Old age and mothers' pension and making appropriation therefor." The body of the act limits the beneficiaries to men and women sixty years of age and upward who are citizens of the United States and have resided in Arizona for five years and who are without visible means of support; all widows, also wives whose husbands have been consigned to penal institutions or insane asylums, who have dependent children, or children looking to them for support, under the age of sixteen years. A continuous blanket appropriation out of the general fund of the state treasury is made to take care of these pensions.

It may be admitted, we think, that so far the legislation falls well within the subject mentioned in the title. The title is limited to providing pensions for old-aged persons and mothers—it does not directly or indirectly refer to the subject of almshouses or county hospitals. The title of the act gave no notice to the voter (it being an initiated measure) that the statutory system of county hospitals or poor farms, so long an institution in this jurisdiction, was to be wiped out of existence and the different counties of the state left

without any means or provisions for the care of their indigent sick and poor, not entitled to pensions. All those men and women under sixty years of age, and those sixty years and upward who are not citizens of the United States, and who have not resided in the state for five years, and all needy and indigent mothers except those enumerated, and all orphans, however needy and deserving of help, if this act be declared valid, would be left unprovided for. A more numerous class would be deserted and forsaken under the terms of this act, if effective, than would be cared for. Those excluded from its benefactions would be driven to the life of mendicants, and be compelled to beg from door to door for shelter, food and medical care. Such unfortunate and calamitous results, a reading of the title of this act, would not portend. Of course, the proponents of the act did not contemplate such results or appreciate the limited number that would be benefited and the numerous class that would be so injuriously affected. It was the generous and philanthropic title of the act that caught the eye and mind and heart of the voter—old age, motherhood and childhood to be protected from want and almshouses—these were the thoughts that influenced and prompted the voter in favor of this piece of legislation. We dare venture that it is not putting it too strong to say that not one voter in a hundred who cast their votes for the measure knew or believed that all of our county hospitals would be abolished, and that so many of the indigent sick and poor would be left without any place for their care or keeping. The very fact that none of the charitable institutions of the state were ever known or designated in the law or in the ordinary intercourse of its citizens as "almshouses" doubtless put the voters off their guard, whereas, if the act had provided in direct and explicit terms that the county poor farms and hospitals throughout the state were to be abolished and sold, the proceeds paid into the state treasury, the voters, being advised of the purpose, would have registered their votes against the measure. If the title of the act had been: "An act to abolish county hospitals or poor farms, to abolish the contracting of the care of the indigent sick and poor and to provide in lieu thereof a pensioning system for the aged, the indigent sick and poor and for widows with dependent children and wives of husbands in prison and insane asylums

with children looking to them for support and making appropriations therefor,'' it would have been as broad as the legislation, and would have been notice to the voters, and not calculated to mislead them.     It would seem that this act, in attempting to abolish the county hospital system for the sick and needy, is palpably a violation of that provision of the Constitution that requires the subject to be set out in the title of the act, and that the legislation shall be confined to that subject and matters properly connected therewith, inasmuch as no reference is made to such institutions by name or as almshouses or otherwise in the title.

The language of the act makes widows and wives of husbands in prison or in insane asylums, who are the mothers of children dependent upon them for support, pensioners, regardless of their financial condition. A mother with the qualification of being a widow or having a husband in prison or in an insane asylum, and having children under sixteen years of age, a citizen of the United States and five years a resident of Arizona, may be a pensioner under this act, even though she may be as rich as Croesus. Her poverty or financial independence do not enter into the question as factors; her fitness and eligibility for pension are not made to depend in any way upon her fortune or lack of fortune, her ability or inability to maintain herself against want. I cannot think that it was the intention of the proponents of this measure that mothers of children under sixteen years of age, possessing independent fortunes or a competency, should be made beneficiaries of this law, yet the language used is broad enough to include all mothers of the designated classes, regardless of their financial ability.

I think the theory upon which a pension system of this kind must be sustained is that the state owes a duty to take care of the unfortunate members of society who, by reason of age or mental or physical infirmity, are unable to care for themselves, and are not the owners and possessors of property sufficient to sustain them from want and beggary. Certainly a citizen and taxpayer ought not to be made or required to help pay pensions to those who have enough and to spare of this world's goods. I can think of no principle of law or justice that could be invoked to sustain a law that required him to do so.

The architects of this act evidently did not take into consideration the structure or system of laws of which it was intended to form a part. It seems to have been drafted without reference to existing laws or the provisions of the Constitution. Its failure to accomplish the purpose intended illustrates the importance that should be observed and exercised by the writers and proponents of laws to be submitted to the legislative branch of government for enactment.

I am persuaded that the strongest advocate of the principle contained in the act in question must admit its inadequacy, not only to effect its object, but that it is actually vicious in attempting to leave out of its protection, and uncared for otherwise, such a numerous class of worthy and dependent people.

Judgment of the lower court is affirmed.

FRANKLIN, J., concurs.

CUNNINGHAM, J. (Concurring Specially).—I concur in the decision arrived at, but for other reasons than those expressed in the majority opinion. The reasons moving are, viz.:

Following the title and the enacting clause are six sections. In order to arrive at a fair understanding of the meaning, I propose to follow a well-known rule of statutory construction and mathematical reasoning and transpose the arrangement of the sections, and in some instances the language of the sections, being careful to preserve the full meaning of the measure. By following such course the body of the act will read as follows:

"Sec. 2. . . . In order to care for aged people of physical infirmities, and widows or wives whose husbands are in penal institutions or insane asylums, they being mothers of children who are under the age of sixteen (16) years, a system of pensioning is hereby established, in the absence of almshouses.

"Sec. 3. The state shall pay to each man and woman sixty (60) years of age and upwards the sum of fifteen ($15.00) dollars per month, as long as such pensioners shall continue to live within this state: Provided always, that said recipients shall be citizens of the United States and residents of Arizona for five (5) years last preceding application; to be entitled

to this pension they must also be without visible means of support.

"Sec. 4. All widows who are mothers of dependent children; also wives whose husbands have been consigned to penal institutions or insane asylums and who have children under the age of sixteen years looking to them for support, shall each be entitled to fifteen ($15.00) dollars per month, and an additional six ($6.00) dollars per month for each child in their keeping under the age above mentioned, irrespective of the mother's age; provided they are citizens of the United States and residents of Arizona five (5) years last preceding application.

"Section 1. All almshouses within the state shall be sold for the best obtainable price, and the proceeds shall be devoted for the purpose hereafter (above as arranged) set forth in this act.

"Sec. 2. . . .

"(a) The Arizona state board of control shall have entire charge of all funds provided for the purpose mentioned, and shall order the same paid by the state treasurer to persons entitled, upon warrants issued by the boards of supervisors of the various counties in the state of Arizona. These boards shall also act as examining boards on the fitness and eligibility of applicants for pensions."

"Sec. 5. There is hereby appropriated out of the general fund of the state treasury a sufficient amount each year to carry out and put into effect the provisions of this act.

"Sec. 6. All acts or parts of acts in conflict with the provisions of this act are hereby repealed."

We have here a system of pensioning provided, to become effective only "in the absence of almshouses," and in that event "to care for aged people and people incapable of earning a livelihood by reason of physical infirmities, and widows or wives whose husbands are in penal institutions or insane asylums, they being mothers of children . . . under the age of sixteen years." These described persons are alone declared to be the objects of the state's grant as contemplated by this act.

The purpose of sections 3 and 4 is clearly to fix the amount which the designated pensioner is entitled to receive from the

state, and prescribe the necessary conditions under which they are deemed to accept the grant and their rights mature.

Section 1 points out the source from which the funds are to be procured from which the pensions may be paid. This source, mentioned, is the exclusive source for providing such fund, unless section 5 may fairly be construed as offering another means of payment of such pensions from the general fund. This question will be noticed later.

Subsection (a) of section 2 places the funds provided "for the purpose mentioned," that is, for the purpose of paying the pensions to the persons declared entitled thereto, in the exclusive charge of the Arizona state board of control, and directs the manner in which and the conditions under which the money shall be paid out and withdrawn from such funds. No doubt can arise in a fair mind that the intention of the act was to sell all almshouse buildings and grounds belonging to the state, theretofore used for the purposes of such almshouses, and obtain therefor the best possible price, and whenever such property shall have been sold and the proceeds of the sale received, such proceeds would become a fund to be used for the exclusive purpose of paying pensions provided for in the act. The state board of control is given the entire charge of the fund. Evidently the proceeds of the sale of all the almshouse buildings and grounds was intended to be placed in the state treasury in a separate fund, and paid out only as provided by subsection (a) of section 2. Such is the clear meaning, purpose and intent of the provisions of the act applicable to that subject.

In addition to the provisions of the act creating a fund out of which to pay the pensions mentioned, section 5 provides:

"There is hereby appropriated out of the general fund of the state treasury a sufficient amount each year to carry out and put into effect the provisions of this act."

The meaning of this section becomes important in the particular of its scope. Is its purpose to make an appropriation out of the general fund, and thereby create a fund, with which to pay pensions, in addition to the fund for that purpose provided from the sale of all almshouses? I think no such meaning can fairly be given to this section. The fund clearly provided for the purpose of paying the pensions is that recovered from the sale of all almshouses, the buildings

and grounds. The state board of control is given the entire charge of such fund, and it may not be used for any purpose other than that for paying pensions. The portion of the general fund sufficient in amount each year "to carry out and put into effect the provisions of this act" is not declared to be or become a portion of the pension fund, and placed in the charge of the state board of control.

What is necessary to be done in carrying out and making effective the provisions of the act? Will the doing of such things necessarily require the expenditure of money other than in the payment of the pensions? Before a fund exists for the payment of pensions authorized, all almshouses, buildings and grounds must be sold and the price for which they are sold must be paid. Usually, in order to accomplish a sale of such property, expenses are incurred, for commissions and advertising, and other incidental expenses, the amount of which is uncertain until determined. The property to be sold may be said to constitute the pension fund, and by a fiction of law, often indulged, be said to be placed in the entire charge of the board of control before sale, in lieu of the proceeds of the sale, before the actual sale. Until the said property is actually sold, the fund is in no condition to be paid out for any purpose; certainly it is in no condition to be applied to the purposes of bringing about a sale of the buildings and grounds used for almshouses.

The act is not effective until the almshouses are actually abolished, and by section 1 of the act it is declared that all almshouses "shall be" abolished, their grounds and buildings sold, and the proceeds shall be devoted to the purposes of the act. Evidently by the expression "shall be" abolished is meant that they shall be considered abolished when the buildings and grounds are actually sold. After this has been done, that is, after the buildings and grounds have been sold, and, therefore, the almshouses are abolished, a system of pensions is declared to be established. Consequently, by the clear meaning of the act, its provisions are not effective until the almshouse buildings and grounds are sold and the proceeds of the sale of the buildings and grounds have come into the entire charge of the board of control, and a pension system is established.

In order to carry out and make effective the provisions of the act, a sale of the buildings and grounds of the almshouses of the state must have been accomplished, and the proceeds received into the charge of the board of control. In order to accomplish this result, doubtless expenditure of money would be required, and such sum of money as may be necessary to accomplish such end was appropriated by the fifth section of the act, from the general fund. By placing such construction on the act, we give to every provision a distinct purpose and meaning. If we give to the fifth section a meaning broad enough to cover both the expenses incurred in selling the almshouse buildings and grounds, and also to provide a fund from which to pay pensions, then we have two funds for the last-mentioned purpose, the first expressly raised for and declared to be devoted exclusively for that purpose, and expressly placed in the entire charge of the board of control, the other, a general appropriation, both in amount and continuing, yet the amount subject to ascertainment only after pensions have actually been paid, and, before payment, belonging in the general fund as a part and parcel of that fund, over which the board of control has no charge whatever. If the legislative intent was to appropriate an amount of the public funds in the general fund, sufficient to pay the pensions granted, after the special pension fund had been exhausted, such may or may not have been done, which we do not now decide, but for a certainty that act does not purport to add anything to the special pension fund arising from the sale of the almshouse buildings and grounds. The money appropriated out of the general fund for the purpose of carrying out and putting into effect the provisions of the act is not placed in the entire charge of the board of control, as the other fund is. It cannot be withdrawn, as the other fund may, on warrants of the boards of supervisors of the several counties, as no such authority is given. Hence, whatever may have been the private intention of the person who prepared the bill for the act, the language used, which is conclusive on the courts in arriving at the legislative intent, will justify only the conclusion that the money appropriated by the fifth section of the act was not intended to be used for the purpose of paying any pension claims, but was clearly intended to be applied to the purpose of reducing the special pension fund

to money, to the end that the act would become effective as establishing a pension system, with a fund from which pension claims may be paid. Conceding, but not deciding, that the subject of granting pensions to persons, such as are described in this act, is a valid exercise of legislative power, then before the grant takes effect as a grant, dischargeable when any of the designated persons may bring themselves within the prescribed conditions and establish thereby their right to take as grantees, the fact must exist that the fund mentioned in the act, or a sufficient portion of such fund, has come into existence; that the fund devoted to that purpose actually exists. Under the express language of the act, that fund does not, nor can, exist, nor the offer of the grant become open to acceptance by the designated grantee, until the almshouses shall have been abolished by an actual sale of the buildings and grounds for the best price obtainable, and the price received is placed in the entire charge of the board of control.

Such is my understanding of the purpose, meaning and scope of the act in question. The purpose was to provide a system by which designated classes of deserving citizens of the state would mature the right to receive from the state payments in the amounts designated, or to be determined, of money from a designed fund on condition that application therefor was made, and the proper authorities were furnished satisfactory proof that the applicant was one of the designated classes offered the grant; that the act making these provisions for a pension system to be established became effective on December 14, 1914, by operation of law; that the system of pensions provided therein was not intended to become effective as a working system until the almshouses were abolished by means of the sale of the buildings and grounds, and the proceeds of the sale delivered into the state treasury and placed under the entire charge of the board of control; that an amount of money was each year appropriated from the general fund to carry out and put into effect the provisions of the act for the establishing of a system of pensions.

The appellee contends that the provisions of the act are not within the fair purport of the subject, as expressed in the title, and therefore such provisions are void under article 4,

section 13, state Constitution. The provision referred to is that:

"Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title."

This contention is without merit, because, as I have above shown, every provision of the act clearly points to the subject of "pensions" expressed in the title, and every provision of the act is connected inseparably with that subject. Even a narrow, technical construction would not exclude any provision of the act, for the reasons urged.

Appellee urges that the act is void, for the reason the act proposes to give aid and make donations to the individuals in violation of section 7 of article 9 of the state Constitution. The provision referred to reads:

"Neither the state, . . . shall ever give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation. . . . "

This provision of the Constitution has no reference to the matters concerning which the act of December 14, 1914, deals. This act does not propose to give or loan the credit of the state in the aid of, or make donation or grant by, subsidy or otherwise to any individual or any other person. The purpose of the act is to sell state property already devoted to almshouse purposes, and apply the proceeds to the same purposes, but to more restricted classes of persons. Nothing is proposed by the act to be given to anyone as a gratuity other than the proceeds of the sale of property already devoted to the same purpose. The other appropriation mentioned is proposed to be used for the legitimate purpose of carrying out and putting into effect the system of pensioning that the act provides shall be established.

Other constitutional objections are suggested as affecting the validity of the act, but upon examination I fail to find them of such importance as to require discussion. They do not have the effect claimed. I have found no constitutional objection to the act in question sufficient to justify a court in holding that the act for that, or any, reason is void.

The serious question presented by the record is whether the provisions of the act, purporting to establish a system of

pensions, and providing for their payment, have become effective for that purpose. Until such provisions are effective, neither the state board of control nor county boards of supervisors have power or authority to act in the matter, and all acts done by these boards in the premises are utterly void as done without authority of law.

In order that such provisions become operative, state almshouses, with grounds, must have existed, which are subject to sale by the state within the contemplation of the act. Such buildings and grounds must have been sold and a pension fund established by the proceeds of such sales. The condition precedent to the establishing of a system of pensions is made by the act, the absence of all state almshouses. So long as state almshouses exist, the system of pensions proposed by the act does not come into existence. The means by which the almshouses are to become abolished is by the sale of the buildings and grounds; and the means by which the system of pensions is proposed to become effective is the pension fund, consisting of the proceeds of the sale of such buildings and grounds.

The appellant board does not assert as a defense the fact that almshouses have existed and have been sold and the proceeds of the sales have been placed in its entire charge, except as a conclusion it alleges that these defendants are authorized by said act to approve and authorize the payment of all lawful claims for pensions which may be presented to these defendants under and by authority of said act. This allegation was not treated as an allegation setting forth an issuable fact, and properly it cannot be so treated, yet the appellant thereby asserts a construction of the act which necessarily includes the existence of all such facts as the act requires to confer the authority on the board in enforcing its provisions. The complaint asserts a construction whereby the meaning given to the word "almshouses" in the act includes "institutions for the benefit of the insane, blind, deaf and mute, and other institutions established for the relief of the needy, required to be established and required to be supported and maintained by the state under the provisions of section 15, article 22 of the state Constitution. . . . "

Thus the issue of the meaning of the word "almshouses" as used in the act is presented for solution. The word as

used in the act is not defined therein, and the scope of its meaning must be determined from the context. The word appears twice in the act. In the first section it is declared that "All almshouses within the state shall be abolished." In the second section, it appears in the connection of reference, viz.: "In the absence of almshouses." No technical use of the word is apparent; therefore it was intended to have no meaning other than that commonly given it as understood and defined by lexicographers, viz.: "A house appropriated for the use of the poor; a poorhouse." Webster's Dictionary. By the same authority a "poorhouse" is defined as, "A dwelling-house for a number of paupers maintained at public expense."

In *Association for Benefit of Colored Orphans* v. *Mayor etc.*, 104 N. Y. 581, 586, 12 N. E. 279, 281, that court, defining the word as used in a tax statute, exempting from taxation, "every poorhouse, almshouse, house of industry and every house belonging to a company," etc., said:

"The building of the plaintiff comes within the fair meaning of an almshouse which is defined as a house appropriated for the poor. This, certainly, is the case with the building of the plaintiff. It is appropriated wholly for the poor who are colored orphans, and where they are . . . educated . . . gratuitously."

This commonly understood meaning of almshouse is clearly the meaning intended to be conveyed by the use of the word in this act, and would exclude from the operation of the act all public, state and county charitable institutions which are not primarily appropriated for the use of the poor. Hence all institutions such as the asylum for the insane, the pioneers' home, county hospitals, institutions for the benefit of the blind, deaf and mute, and all other institutions established for specific purposes of a like nature, other than primarily for the use of the poor, are not commonly understood as included in the meaning of the word "almshouses," and consequently are unaffected by the act in question.

We are left to conjecture as to whether in fact almshouses actually existed when the act became effective on December 14, 1914; also, whether the buildings and grounds used for the purposes of almshouses existed and were subject to sale as the property of the state, or have been sold. These are

matters of defense; and, as the defendants have failed to assert them, we must presume the facts did not exist. In the absence of the existence of almshouses, buildings and grounds, subject to sale, no fund could come into existence with which to make effective a pension system, and hence, when the pension claims were considered, approved and ordered paid, no law was in force in this state authorizing and empowering the state board of control to order the payment of such claims.

The conditions precedent to the going into effect of the provisions of the act establishing a pension system have not been shown to have been performed. Consequently those provisions are dormant, and, while dormant, confer no authority on the officers mentioned to enforce them. They lie as general municipal incorporation statutes, local option, and such like statutes, inoperative until the things requisite to be done to make them effective have been done.

I am of the opinion that the act of December 14, 1914, confers no legal authority upon the state board of control to do the things complained of, and therefore the judgment of the court in the premises was right, and should be affirmed.