**BJORNSON v. ALASKA S. S. CO.**

No. 13019.

United States Court of Appeals
Ninth Circuit.

Dec. 17, 1951.

J. Duane Vance, Bassett, Geisness & Vance, Seattle, Wash., for appellant.

Bogle, Bogle & Gates, Edward S. Franklin, Seattle, Wash., for appellee.

Before DENMAN, Chief Judge, ORR, Circuit Judge, and DRIVER, District Judge.

DRIVER, District Judge.

Appellant, who is a seaman, recovered judgment against his employer for personal injuries sustained in the performance of his duties on shipboard. The action was tried to the court without a jury. The court found appellant's damages for loss of wages and pain and suffering to be $1500 but reduced the amount awarded to $750 on account of contributory negligence of appellant. The sole question presented by the appeal is whether the court erred in finding that appellant suffered no permanent disability.

The civil rules direct that "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed. Rules Civ.Proc. rule 52(a), 28 U.S.C.A. By the quoted provision the civil rules adopted the then prevailing equity practice. The provision as construed by the courts does not mean that even when supported by substantial evidence and based upon oral testimony the findings of the trial court shall be conclusive. And it does not mean that the reviewing court shall determine from the record where the weight of the evidence lies. It is not clearly erroneous for the trial court to choose between two permissible but conflicting views as to the weight of the evidence. United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 94 L.Ed. 150. A finding supported by substantial evidence may be said to be "clearly erroneous" if the reviewing court, after consideration of all of the pertinent evidence, has a "definite and firm conviction that a mistake has been committed." United States v. United States

Gypsum Co., 333 U.S. 364, 394, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746.[1]

In the present case then we must examine all of the evidence bearing on the point in order to determine whether or not we can say with firmness and assurance that the trial court erred in finding that appellant suffered no permanent disability.

Appellant was injured on January 14, 1949, when a ladder which he was using slipped and he fell fifteen feet to the deck of the ship. He put out his right hand to break the fall and his injury (except a bruise on his right hip from which he fully recovered) was in the area of the right wrist joint. Appellant's ship was then on a voyage to Japan and upon its arrival there his wrist was placed in a cast by an army physician. The cast was removed and a metal splint substituted therefor at the United States Marine Hospital in Seattle where appellant was admitted to the outpatient department on February 21, 1949. After receiving outpatient physiotherapy treatment appellant was discharged as "improved, fit for duty" on April 20, 1949. The hospital record shows "Diagnosis Fracture, distal end of right radius" with "Prognosis Good".

At the trial, which commenced on February 27, 1951, appellant testified that his wrist was still stiff and pained him sharply when he bent it back in doing his work. As to the "grip" of his right hand, he did not "trust it as much" as before the accident. On cross examination he said that he had gone to sea again upon his discharge from the Marine Hospital and had worked steadily as a seaman with the exception of the summer of 1950 when he was "on the beach" because his ship was laid up. He had earned large amounts of extra wages—sometimes two or three times the amount of his base pay—for overtime and cargo or longshore pay. He had never lost any wages or overtime pay because of the condition of his wrist and had received no medical treatment for his wrist since leaving the hospital.

Appellant's medical witness, Dr. Burgess, a specialist in orthopedic surgery, testified, from one examination of appellant made on June 10, 1950, that he found a definite limitation of motion of the right wrist compared with the left wrist. He found the limitation on dorsiflexion or extension to be eighty degrees of the left wrist and sixty degrees of the right wrist, or a twenty degree limitation. On frontal flexion or bending the wrist forward he found a limitation of seventy degrees of the left wrist and sixty degrees of the right wrist. "Deviation of the wrist to the radial and ulnar aspects, that is shifting of the wrist from side to side, corresponded on the two sides, as did rotation—that is pronation and supination—of the wrist."

Dr. Burgess also testified that there was definite tenderness "over the radial carpal joint," both its dorsal and radial aspects, that is to say, over the back and over the thumb side. The wrist was thicker than normal "at this point", a "bony thickening" or thickening of the bone and its "covering". There was also definite crepitus or grating or cracking of the cartilage of right wrist on passive movement and twenty-five per cent loss of strength in grip of the right hand as compared with the left.

Dr. Burgess further testified that X-rays of appellant's right wrist taken at the time of the examination and admitted in evidence at the trial showed changes in the bones comprising the wrist joint in the nature of a localized loss of lime substance, that is demineralization, in the carpal scaphoid bone and "an irregularity between the two carpal bones which articulate with the radius, that is the forearm component of the wrist joint * * *." Those, he said, were all the significant things in the X-rays. It was his opinion that the disability present on examination and the "changes in the X-ray" were the result of appellant's injury, that the condition was "essentially fixed" and that it gave appellant permanent partial

1. See also: Grace Bros. v. C. I. R., 9 Cir., 173 F.2d 170, 174; Lassiter v. Guy F. Atkinson Co., 9 Cir., 176 F.2d 984, 993; Pacific Portland Cement Co. v. Food Machinery & Chemical Corp., 9 Cir., 178 F.2d 541, 548; West v. Conrad, 9 Cir., 182 F.2d 255.

disability equal to twenty per cent of the "amputation rate at the right elbow."

Appellee's medical expert, also an orthopedic surgery specialist, Dr. Buckner, testified that he had examined appellant on one occasion, July 31, 1950. Appellant then complained that he still had an ache in his right wrist and that his hand had a tendency to go numb occasionally. Dr. Buckner found, however, that appellant had full function, normal extension and flexion of the wrist, the rotation of the forearm was normal and no sensory disturbance was noted. Appellant did not complain to Dr. Buckner that he had any stiffness in his wrist. X-rays taken by Dr. Buckner at the time of the examination were admitted in evidence. He pointed out, in the film, a line across the lower end of the radius having the appearance of a fissure fracture "which is now completely healed and hardly visible, the very faintest line." He could find no evidence of any injury to the carpal bones adjoining the radius bone and observed no evidence of "decalcification" of them. He also examined the X-ray films taken by Dr. Burgess and while he could see the line representing the fissure fracture of the radius in one of them he observed no evidence of trauma to the carpal bones immediately adjoining the radius bone. Dr. Buckner thought appellant "had made a complete recovery." He could see no substantial difference between the X-ray pictures which he had taken and those taken by Dr. Burgess.

Dr. Exner, a physician who specialized in radiology and X-ray diagnosis, called as a witness by appellant, examined the X-ray films taken by Dr. Burgess. He testified that the film showed a definite narrowing of the joint space normally occupied by the joint cartilage of the wrist joint—specifically, the joint between the radius and the carpal bones. The end of the radius appeared slightly irregular and showed a slightly abnormal increase in density—in the amount of calcium content. Dr. Exner thought that the Buckner X-ray film showed slightly more abnormality than the Burgess film, although he said that since the films were not taken under "strictly comparable conditions" it was not possible to express an opinion "with complete certainty". Dr. Exner thought that the condition of appellant's right wrist shown in the X-ray films could have been caused by appellant's fall from the ladder.

Dr. McConville, an associate of Dr. Buckner, had examined appellant on March 8, 1950. Called as a witness for appellant, he testified that the examination disclosed a ten degree loss of flexion in appellant's right wrist, a fifteen degree loss of dorsiflexion and a "slight amount" of loss of ulnar and radial deviation. Dr. McConville attributed the loss of motion to thickening of the capsule of the joint. At the time of the examination he had taken X-ray pictures which showed complete healing of the wrist. He had no means of knowing what improvement there had been in appellant's condition since the examination or whether the thickening of the joint capsule had disappeared.

Appellant earnestly urges that the expert testimony corroborates Dr. Burgess and contradicts Dr. Buckner to such an extent as to show clearly the error of the trial judge in basing his findings on the testimony of the latter. Only Dr. Burgess and Dr. Buckner testified directly as to whether appellant had suffered permanent disability. The former said that he was permanently disabled and the latter said that he was not. The trial judge in a discussion of the findings with counsel said in effect that he did not "believe" Dr. Burgess' testimony.

Dr. McConville found limitation of motion in the wrist and to that extent his testimony corroborated that of Dr. Burgess. We should bear in mind, however, that the examinations were made at different times: Dr. McConville examined appellant March 8, 1950; Dr. Burgess on June 10, 1950; and Dr. Buckner on July 31, 1950. It seems unlikely, considering the date of the injury, January 14, 1949, that appellant should achieve such a spectacular recovery between March 8 and July 31, 1950, but it is a possibility that cannot be altogether disregarded. In fact, it has some support in the undisputed testimony. On March 8th Dr. McConville found a slight amount of loss of motion of ulnar and radial devi-

436

ation but Dr. Burgess found none on June 10th. Dr. Burgess said he used a device that accurately measures loss of mobility of the wrist joint without any dependence upon cooperation of the patient but unfortunately he did not use it to test the appellant's condition at the time of the trial. The record is silent as to any medical examination of appellant after July 31, 1950. It is a matter of common lay knowledge that stiffness of the wrist joint induced by injury does improve with use and the passage of time. And in the instant case the appellant had been performing the heavy manual labor of his calling, earning large amounts of overtime pay without any loss of time or any further medical treatment of his injury after April 20, 1949.

Dr. Buckner saw no abnormality in the X-ray films, it is true, and Dr. Exner, the radiologist, found abnormality. However, while Dr. Burgess and Dr. Exner both found abnormality in the films, to a medical layman they seem to disagree as to the nature of the abnormality. Dr. Burgess observed in the X-ray "a localized loss of lime substance, that is demineralization, in the carpal scaphoid and an irregularity between the two carpal bones which articulate with the radius * * *." The carpal scaphoid is more commonly known as the navicular [2] and the two bones of the wrist joint which articulate with the radius are the navicular (or scaphoid) and the lunate.[3]

Dr. Exner did not mention any demineralization of the carpal bones or any irregularity between them. He found in the X-rays "a definite narrowing of the joint space which is normally occupied by the joint cartilage. The end of the radius is slightly irregular and shows a slightly abnormal increase in density, that is in the amount of calcium content." The following quotation from Dr. Exner's testimony shows that he pointedly declined to say that he found any irregularity between the scaphoid or navicular and lunate bones. "The cartilage is thinner than normal and just beneath the cartilage the bone contains an abnormal

amount of calcium, which is, in general, a reaction to any irritative process. Q. [By appellant's counsel] Is what you are referring to the scaphoid lunate joint? A. No, that is the—well, it is really the wrist joint. Strictly speaking, it is the joint between the radius and the carpal bones." Dr. Exner was not asked what effect the abnormality which he observed would have on the mobility of the wrist joint or whether or not the condition was permanent.

To one who is medically unskilled, Dr. Burgess and Dr. Exner seem to have found different abnormalities in the X-ray films. Dr. Burgess found a loss of mineral in the carpal bones and irregularity between the carpal bones. Dr. Exner found a narrowing of the cartilage between the lower end of the radius and the carpal bones and an abnormal deposit or addition of mineral to the end of the radius. Perhaps a medical expert could explain the seeming inconsistency but unfortunately the record must now be read and analyzed by laymen in the medical sense.

After giving careful consideration to all of the evidence we are unable to say that we have a "definite and firm conviction" that the trial judge who heard and observed the witnesses erred in finding that appellant did not suffer permanent disability.

Judgment affirmed.

---

2. Blakiston's New Gould Medical Dictionary, 1st Edition, 907 Appendix, Table of Bones 1184.

3. Gray's Anatomy, Goss, 25th Edition, p. 199.