The GAMEWELL COMPANY, a Corporation, Appellant,

v.

The CITY OF PHOENIX, a Municipal Corporation, Appellee.

No. 13635.

United States Court of Appeals Ninth Circuit.

Nov. 15, 1954.

Rehearing Denied Jan. 3, 1955.

disqualified from prosecuting the members of the group.

Henry E. Foley, Clarence I. Peterson, Lawrence A. Sullivan, Foley, Hoag & Eliot, Boston, Mass., Walter Linton, Mark Wilmer, Snell & Wilmer, Phoenix, Ariz., for appellant.

Richard Fennemore, Walter E. Craig, Fennemore, Craig, Allen & Bledsoe, William C. Eliot, City Atty., City of Phoenix, Phoenix, Ariz., for appellee.

Before BONE and POPE, Circuit Judges, and YANKWICH, District Judge.

YANKWICH, District Judge.

The appellant, a Massachusetts corporation, instituted an action in the United States District Court for the District of Arizona to recover various sums as follows: $7,146.27, $416,984.00, interest upon the sum of $416,984.00, at the rate of six per cent per annum from March 8, 1950, until paid, $24,742.00, conditioned upon appellant causing delivery of cable to appellee, or, if appellee elects not to receive the cable, then, for the sum of $22,873.15, claimed to be due to it from the appellee, the City of Phoenix, under a contract to install a fire alarm system for the total sum of $678,779.00, awarded to appellant on July 25, 1949, which the City had terminated before completion in March, 1950.

A second cause of action sought a declaration of rights, 28 U.S.C. §§ 2201–2202, to determine whether the contention of the City that the contract was void because it provided for 90 per cent instead of 75 per cent progress payments and that there was no compliance with Section 10–610, Arizona Code Annotated, 1939, was correct.

The Answer challenged the sufficiency of the specifications for bids in many respects, and, generally, alleged that the specifications were so drawn that no one but the appellant could enter a competitive bid thereon. It also sought in a counterclaim to recover progress payments made to appellant.

As the allegations of the pleadings have been transmuted into findings and judgment, we are to determine the correctness of the adjudication.

The court gave judgment against the appellant on its causes of action and in favor of the City on the counterclaim for the progress payments made to the appellant in the sum of $287,123.52.

## I

### The Effect of Findings

In this appeal from the judgment, the appellant has challenged the sufficiency of the findings and insists that they are erroneous and unsupported by any evidence in the record and that the court erred, as a matter of law, in awarding judgment to the City on its counterclaim.

■ The Findings stand before us with the presumption of validity unless they are clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C. The object of the clause as to the effect of findings is to give to findings the effect which they formerly had in equity. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746. The aim is to

"* * * make allowance for the advantages possessed by the trial court in appraising the significance of conflicting testimony and reverse only 'clearly erroneous' findings." Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., 1949, 336 U.S. 271, 275, 69 S.Ct. 535, 537, 93 L.Ed. 672.

This advantage has been well stated by the Court of Appeals for the Second Circuit:

"For the demeanor of an orally-testifying witness is 'always assumed to be in evidence.' * * * The liar's story may seem uncontradicted to one who merely reads it, yet it may be 'contradicted' in the trial court by his manner, his intonations, his grimaces, his gestures, and the like—all matters which 'cold print does not preserve' and which constitute 'lost evidence' so

far as an upper court is concerned." Broadcast Music, Inc., v. Havana Madrid Restaurant Corp., 1949, 175 F.2d 77, 80.

Conversely, the Supreme Court has held that a finding is clearly erroneous when

"* * * although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., supra, 333 U.S. at page 395, 68 S.Ct. at page 542.

To the same effect is United States v. Oregon State Medical Society, 1952; 343 U.S. 326, 339, 72 S.Ct. 690, 96 L.Ed. 978.

Of course, if an erroneous legal conclusion is drawn by a trier of fact, it will be set aside. In re Leichter, 3 Cir., 1952, 197 F.2d 955, 957; Ward v. Deavers, 1952, 92 U.S.App.D.C. 167, 203 F.2d 72, 76; Staunton Industrial Loan Corp. v. Wilson, 4 Cir., 1951, 190 F.2d 706, 709, 710.

■ As the first ground of appellant's attack on the judgment is the insufficiency of the findings, these preliminary observations will appear important in the course of the discussion. Before considering in detail the objections to the findings, the obvious should be stated that, as this is a diversity case, 28 U.S.C. § 1332, the substantive law of Arizona controls in determining the validity of the contract from the terms of which this litigation springs.

## II

### State or Municipal Law as to Notice

A contention made by the City which, if sustained, would dispose of the litigation, is that the contract is invalid because it required a forty-days notice. Section 10–610, Arizona Code Annotated 1939. The section is reproduced in the margin.[1]

---

1. "[Sec.] 10–610. Erection of buildings for which bonds voted—Method of payment.—If such bonds are issued for the

purpose of erecting and furnishing any public building, the board of supervisors, for a county or school district, and the

It is an elementary principle of long standing of municipal law that where the method of the exercise of the power is prescribed by state or local law, the "mode becomes the measure of the power". 63 C.J.S., Municipal Corporations, § 979, page 532; Zottman v. City and County of San Francisco, 1862, 20 Cal. 96, 102; McCloud v. City of Columbus, 1896, 54 Ohio St. 439, 44 N.E. 95; Potts v. City of Utica, 2 Cir., 1936, 86 F.2d 616, 619; Laurent v. City and County of San Francisco, 1950, 99 Cal. App.2d 707, 708, 222 P.2d 274. This principle is recognized in the law of Arizona. Barron G. Collier, Inc., v. Paddock, 1930, 37 Ariz. 194, 291 P. 1000, 1001–1002; State Board of Control v. Buckstegge, 1916, 18 Ariz. 277, 158 P. 837, 839.

In State Board of Control v. Buckstegge, supra, the principle is stated in this manner:

"The law is well settled that, where the method of exercising powers conferred by statute upon municipal corporations is specifically prescribed, that method must be followed. City of Nevada [to Use of Gilfillan] v. Eddy, 123 Mo. 546, 27 S.W. 471; Lincoln St. Railway [Co.] v. City of Lincoln, 61 Neb. 109, 84 N.W. 802; 2 Dillon, Municipal Corporations, §§ 571, 572; City [of Ft. Scott, Kan.] v. [W. G.] Eads [Brokerage Co.], 8 Cir., 117 F. 51, 54, 54 C.A.A. 437. And when any other method than that prescribed is followed, such acts are without jurisdiction and wholly void. City [of Ft. Scott, Kan.] v. [W. G.] Eads [Brokerage Co.], supra."

And when, by statute or city ordinance, certain types of bids are recognized and notice for a definite time is required to be given, a contract entered without such notice is invalid. McQuillin on Municipal Corporations, 3 Ed., 1950, Vol. 10, Sec. 29.26; 63 C.J.S., Municipal Corporations, § 999; Berryhill Office Equipment Co. v. Phillips, 1929, 35 Ariz. 180, 276 P. 4. And where the contract calls for the ·construction of buildings, the contract must contain all the necessary information or refer to available specifications on file, and the specifications must be on file for the entire period of the notice. Berryhill Office Equipment Co. v. Phillips, supra; Comstock v. Eagle Grove City, 1907, 133 Iowa 589, 111 N.W. 51; Jenkins v. City of Bowling Green, 1932, 251 Ky. 119, 64 S.W.2d 457, 459.

The notice actually given here was eighteen days. It is the contention of the appellant that the matter is governed by Section 2 of Article 19 of the Phoenix City Charter, which requires only five days notice. This contention is based on Section 16–303, Arizona Code Annotated 1939, which provides that when a city has adopted a charter, the charter supersedes any provision in the general law relating to the same matter.

The City contends that because fire protection is a matter of state concern, and because part of the bond issue was for the acquisition of sites and the

governing body of a city, town, or other municipal corporation, shall adopt plans and specifications for such building, and as soon as practicable thereafter, advertise for bids for the erection and furnishing of said building, stating a day and hour, not less than forty (40) days from the date of such notice, when said bids shall be received and opened. The governing body or board shall award the contract to the lowest and most responsible bidder, but any and all bids submitted may be rejected. If a bid be accepted, said body or board shall require the successful bidder to enter into a written contract for the erection and completion of said building and the furnishing thereof, and require from him a bond in the amount of the contract, conditioned upon the faithful performance of the contract, such bond to be approved by the body or board. Such body or board may agree to pay the contractor upon the completion of one-third of the work, one-fifth of the contract price; upon completion of two-thirds of the work, an amount, sufficient with the prior payment to make one-half of the contract price; and the balance of the contract price upon the completion and acceptance of the work by said board. If it is necessary to purchase a building site, the call for the election

building of new buildings, the State law requiring forty days notice prevailed. It is the law of Arizona that the provisions of local charters relating to legislation of a general nature must give way to state law when there is conflict between the two. Clayton v. State, 1931, 38 Ariz. 135, 297 P. 1037; American-La France Foamite Corp. v. City of Phoenix, 1936, 47 Ariz. 133, 54 P.2d 258, 259; Luhrs v. City of Phoenix, 1938, 52 Ariz. 438, 83 P.2d 283; City of Tucson v. Arizona Alpha of Sigma Alpha Epsilon, Inc., 1947, 67 Ariz. 330, 195 P.2d 562.

Granted that *fire protection* is a matter of general state interest, Luhrs v. City of Phoenix, supra, the state provision relating to notice is directed chiefly to bond issues for the "erection and furnishing" of public buildings. And to make such provision applicable to a chartered city would be as illogical as to apply to such cities general statutes relating to notices to sell real estate. This the Arizona Supreme Court has refused to do upon the ground that "a charter city is sovereign in all its 'municipal affairs' where it has the power." City of Tucson v. Arizona Alpha of Sigma Alpha Epsilon, Inc., supra, 195 P.2d at page 565.

■ While the bond issue here contemplated the acquisition of sites and the building of buildings, its major object was to *extend the fire protection system of the City*, a matter which is more consonant with the local self rule which the Arizona statute recognizes in the case of chartered cities. Sec. 16–303, Arizona Code Annotated 1939. Surely the City of Phoenix having "the power" to establish its own fire protection system should be "sovereign" in the matter of letting contracts for it.

The contract under consideration related to one of the specific purposes of the bond issue,—"*to extend the existing fire alarm system*". While some of the equipment was to be located in buildings erected or to be erected, it was separate and apart from them. Clearly the extension of the fire alarm system cannot be considered a part of the erection of a building.

The word "furnishings" should be given its ordinary meaning,—that is, "furniture" or equipment of the type which the court had under consideration in Berryhill Office Equipment Co. v. Phillips, 1929, 35 Ariz. 180, 276 P. 4.[2]

We conclude that the notice given,— that required by the Charter of the City of Phoenix,—was adequate as to time.

### III

### Competitive Bidding

The conclusion reached as to the adequacy of the notice makes it necessary to consider the sufficiency of the court's findings. As the findings found the specifications to be both restrictive and inadequate, it is well to consider generally the legal requirements as to specifications accompanying bids by municipal corporations.

■ The object of competitive bidding is to invite competition, by allowing all persons having the ability to furnish the supplies or materials or to perform the work to compete freely without any unreasonable restrictions. McQuillin on Municipal Corporations, 3 Ed., 1950, Vol. 10, Sec. 29.44. In order to make competition effective, specifications for the job must be filed describing the nature of the work. 63 C.J.S., Municipal Corporations, §§ 997–999.

---

shall state the amount to be expended therefor. (Laws 1912, ch. 29, § 16, p. 61; R.S.1913, § 5282; rev. R.C.1928, § 2666.)"

**2.** In contracts of this character involving municipalities, the courts have interpreted the word "furnishings" to include equipment such as plumbing and heating systems, cells in a jail and the like. Judd v. Consolidated School District No. 3, 1933, 227 Mo.App. 921, 58 S.W.2d 783; Pauly Jail-Bldg. & Mfg. Co. v. Board of Commissioners, 1895, 8 Cir., 68 F. 171; Sarver v. Los Angeles County, 1909, 156 Cal. 187, 103 P. 917; and see, Vale v. Boyle, 1918, 179 Cal. 180, 175 P. 787. However, these were *all* installations *in* buildings, while in the case before us, *only part* of the equipment was to be in buildings.

The general rule as to specifications is thus stated in 63 C.J.S., Municipal Corporations, § 998:

"One of the essentials to competitive bidding is that bidders shall have opportunity to bid on the same thing; that is, there must be a common standard of bidding since otherwise it would be impossible to compare bids and ascertain the lowest bidder."

The requirement is that specifications be such that all parties can familiarize themselves with the details. They must be free of provisions, the effect of which would stifle competition. Van Antwerp v. Board of Commissioners of City of Mobile, 1928, 217 Ala. 201, 115 So. 239; Waszen v. Atlantic City, 1949, 1 N.J. 272, 278, 63 A.2d 255; Otter Tail Power Co. v. Village of Elbow Lake, 1951, 234 Minn. 419, 49 N.W.2d 197, 27 A.L.R.2d 906; Heninger v. City of Akron, Ohio App.1951, 112 N.E.2d 77.

Section 3 of Article 19 of the Phoenix Charter provides:

"Sec. 3. Bids.

"In the erection, improvement and repair of all public buildings and works, in all street and sewer work, and in furnishing supplies and materials for the same, or for any other use by the city, when the expenditure required exceeds the sum of Five Hundred Dollars ($500.00), *the manager shall advertise for bids for the work contemplated, and for furnishing such supplies and materials, and ask for sealed proposals.*

"*The advertisement for bids shall distinctly and specifically state the character of the work contemplated and the kind of supplies and materials required.* Such notice shall be published at least once in the official newspaper, and posted on a bulletin board in front of the City Hall for not less than five (5) days. The manager may, with the consent of the council, let the contract to the lowest responsible bidder, may reject any and all bids, and may re-

advertise for bids, or provide for the work to be done under his direction and supervision and purchase all supplies and material required." (Emphasis added.)

The Supreme court of Arizona, in interpreting a requirement of this character in the State law, said:

"The authorities agree that such specifications should be made and adopted in advance of ordering the advertisement, and there would be no object in so doing, except that they might be available to bidders during the whole period of advertising. The advertised notice must either contain all the data necessary to inform the general public of what is wanted, or refer to specifications on file for such information, and if the latter method is adopted the notice would most certainly be defective and incomplete, unless the plans and specifications were on file for inspection during the whole period of publication." Berryhill Office Equipment Co. v. Phillips, supra, 276 P. at page 7.

■ A city may designate a special product which may be covered by a patent or is manufactured by one bidder. And there are cases holding that where the equipment is covered by a patent, of necessity, the description of one article would exclude others. In such cases, competitive bidding may be entirely excluded. Hendricks v. City of Minneapolis, 1940, 207 Minn. 151, 290 N.W. 428; Hodgeman v. City of San Diego, 1942, 53 Cal.App.2d 610, 128 P.2d 412. Arizona has recognized the principle by allowing patented materials, such as patented paving, to be specified. Farmer v. Dahl, 1918, 19 Ariz. 395, 171 P. 130; United States Fidelity & Guaranty Co. v. California-Arizona Const. Co., 1920, 21 Ariz. 172, 186 P. 502; Feland v. City of Phoenix, 1923, 25 Ariz. 317, 217 P. 65. These cases go on the assumption that although a patented product is specified, other bidders can secure it and supply it. Braun, Bryant & Austin v. McGuire, 1927, 201 Cal. 134, 142, 255 P. 808. But

where the specifications are so worded that they are, in reality, a particular bidder's specifications, unless the matter comes within the exception noted,—such as parking meters,—the bidding is invalid. As said by the Supreme Court of Alabama in Van Antwerp v. Board of Commissioners of Mobile, supra:

"One of the essentials to competitive bidding is that bidders shall have opportunity to bid on the same thing. In case of public improvements or plants, the adoption of plans and specifications made available to all as a basis of their bids is a legal requirement. When bids are called for from manufacturers of different types of plants based on their own specifications, the necessity arises to determine whether any of them meet the specific needs of the city, and, if so, which is the better bid all things considered. *This cannot be termed competitive bidding within the meaning of mandatory statutes requiring the awarding of contracts to the lowest bidder, and usually contracts so let are regarded as in violation of such statutes.*" 115 So. at page 242. (Emphasis added.)

## IV

### The Court's Findings Are Not Clearly Erroneous

The court's Findings, as they relate to the specifications, may be summed up in this manner:

From some time in the year 1947, Ben Allen, a salesman for Gamewell, not an engineer, was a frequent visitor at the City Engineer's office. Prints of some seventy maps which had been prepared by the City Engineer's staff and having to do with the proposed fire alarm system were delivered to Allen by the City Engineer. Some were based on data furnished by Allen, others were not. The Superintendent of Fire Alarms, in company with Allen made numerous visits to the telephone company for the purpose of securing information concerning the assignment of ducts by that

company for city use and available for fire alarm use. The information so obtained was used in the preparation of these maps by the City Engineer at the request of Allen. (III)

The maps so made were completed at least three months before the call for bids for the system was made. They remained the property of the City of Phoenix on file in the office of the City Engineer. The maps reflected locations and names of streets, fire alarm box locations, all ducts available for use in the proposed fire alarm system, rights of way, location of utility poles and similar information required in the preparation of a bid to furnish and install a fire alarm system in the City of Phoenix. (IV)

The specifications and accompanying map described the type and kind of fire alarm system which the city officials desired but did not have sufficient detail in and of themselves to permit preparation and submission of a bid. The information not shown related to the following matters: Where the various sizes of cables were to be installed, length of runs, extent of underground conduits available for installation of cable, location of existing cables to be removed, location of fire alarm headquarters or fire alarm stations. (V)

The specifications contained the following feature:

"Unified System. The code boxes, gongs, tappers, recorders, transmitters, registers, voice communication equipment, central station switchboard, and other major parts shall constitute a unified system, for the satisfactory operation of which one manufacturer shall be responsible. The system shall be of the type and character as designated by National Board of Fire Underwriters Pamphlet No. 73 as Type A. All equipment shall be the products of manufacturers *experienced in this line of work and shall be of a commercial standard that has proven satisfactory in service for an ap-*

*proved length of time."* (Emphasis added.)

The court found that this constituted a restrictive feature of the specifications and prevented competitive bidding. (VI)

The existing fire alarm system which the new installation was to improve and expand was mainly of Gamewell manufacture. (VII)

The specifications called for items of equipment corresponding to Gamewell equipment. In many instances, the language of the Gamewell proposal and that found in the specifications is identical. (VIII)

The assembling of the information necessary to prepare a competitive bid not contained in the specifications and map would have required the expenditure of substantial sums of money by the prospective bidder. (IX)

Many items of equipment specified were manufactured solely by the appellant. (X)

Only appellant could qualify for the requirement that one manufacturer should be responsible for the satisfactory operation of the major parts of the proposed fire alarm system. (XI)

Appellant had obtained the information not contained in the specifications and map which was necessary for the preparation and submission of a bid prior to the date of the call for bids. (XII)

Appellant regularly circularized the known contractors interested in appellant's type of equipment with proposal for the sale of the equipment. (XIII)

Because of the expenditure involved in assembling information not furnished by the specifications and map and the requirement that numerous items manufactured solely by the appellant be furnished and installed and of the requirement that one manufacturer be responsible for the satisfactory operation of the major parts of the proposed fire alarm system, no one other than the appellant could, in fact, have submitted a properly engineered competitive bid upon the proposed fire alarm system. (XIV)

The call for bids did not consider the insufficiency and restrictiveness of the specifications, did not invite competitive bidders as required by the law of Arizona and the Charter and ordinances of the City. (XV)

Upon these Findings the court concluded that the contract was void and against public policy and that appellant could not recover by reason of the breach and that the appellee was entitled to recover the progress payments in the sum of $287,123.52.

■ A study of the record shows that there was ample evidence to support these Findings. The court found specifically that the specifications were incomplete in that the circuiting of the proposed fire alarm system was not worked out. There is in evidence in the record an exhibit of seventy maps. This exhibit has on it the location of 13,480 existing poles. It shows a total of 267.5 blocks of underground ducts, of which 205 blocks of ducts were available to the City, 59 blocks of ducts were not available to the City, and as to 3.5 blocks, the exhibit has no information as to availability. In addition, the maps disclose fifty changes of duct assignment on ducts available to the City.

There is in evidence in the record that this information was contained on data obtained for a period of months by the appellant's employee, Ben Allen, who worked with the employees of the City Engineering Department over a period of three or four months prior to the call for bids. To supply the deficiency, the City would have to furnish the size and location of new cable, the length of sections of new cable, the location of available underground ducts, the location of fire station and alarm headquarters.

■ It is conceded that complete circuiting was necessary to prepare an intelligent bid. But it is insisted that any person could have obtained this information. But there is evidence in the record that it would have required the expenditure of anywhere from ten to fifty thousand dollars to secure these data so as to

bid intelligently, and that it could not have been done within the time allowed. While the trial court refused to adopt any specific figure, it stated that the addition of the missing information would have required the expenditure of "substantial sums". When we consider that Gamewell's representative was on the ground for several months and that the specifications as adopted referred by name to certain of their equipment, it is quite evident that these were not the City's specifications, but those of Gamewell. And there is no competitive bidding where the bidding is on the bidder's specifications. Van Antwerp v. Board of Commissioners of Mobile, supra.

Here the restrictive and unrestrictive items were so tied together that real competitive bidding was impossible. Under the specifications, the code boxes, gongs, tappers, recorders, transmitters, registers, voice communication equipment, central station switchboard, and other major parts were required to be a part of a *unified system* for the satisfactory operation of which *one manufacturer* should be responsible.

It cannot be denied that the equipment called for was items manufactured solely by Gamewell, some of which were referred to by their trade name.

Reference has already been made to cases which permit the designation of patented articles or materials. See, Braun, Bryant & Austin v. McGuire, 1927, 201 Cal. 134, 255 P. 808. But the cases are based on the assumption that any person other than the owner of the patent bidding on the article could obtain it in the open market. There is no showing in the record that other manufacturers could have purchased, or would have been supplied with the equipment by Gamewell. More, the specifications were so worded that the City Manager could have withheld all approval to all equipment except that manufactured by Gamewell which had proved satisfactory to the City Manager.

The Supreme Court of Arizona has condemned such "package" deals. In Prescott Courier, Inc., v. Moore, 1929,

35 Ariz. 26, 274 P. 163, bids for publishing the Minutes of a Board of Supervisors and other types of printing were so combined that only newspapers of general circulation could supply them all. They were held to be invalid, the court saying:

"These last three classes of work can be done by any job-printing establishment as well as by a newspaper. The advertisement, however, calling as it does for a lump bid, in effect limits the bidders on any of the work to newspapers within the county of Yavapai, which have been published for one year, thus granting to such periodicals a privilege (that of bidding on public printing) which is not extended on the same terms to other citizens." 274 P. at page 165.

It is clear that the inclusion of Gamewell equipment with other equipment could have had one purpose only, and that is to make Gamewell the only bidder.

Much is made of the fact that there is no finding of bad faith on the part of the City Officials. The law of Arizona seems to be that if there is no compliance with the requirement as to competitive bidding, it matters not whether the contract is entered into in good faith or not. Indeed, the Supreme Court of Arizona made it very plain in Berryhill Office Equipment v. Phillips, supra, that neither favoritism nor fraud is necessary to invalidate non-compliance with a request for bidding when they said:

"While reversing the lower court, we wish to say that *no suggestion appears in the record of favoritism or fraud on the part of the board of supervisors or the architect in proceeding in the manner disclosed. We arrive at our conclusion because both the law and public policy concur in a construction of our statute that will secure to the taxpayers, who must ultimately 'foot the bill,' the equipment desired under actual competition, and at the same time protect those representing the county*

*from unjust and unfair criticism."* 276 P. at page 8. (Emphasis added.)

We now refer to the testimony of some of the witnesses for the appellee whom the court evidently believed, for it adopted their views as to the inadequacy and restrictiveness of the specifications.

C. Warren Bogan is a professional engineer operating in the consulting field in electrical mechanical work with an office at Washington, D. C. He graduated from the University of Maryland with a Bachelor of Science degree in electrical engineering. He has held very many jobs. His organization consists of seventeen men, all engineers working for him. He expressed the view that the specifications and the maps that accompanied them were insufficient. In addition to restrictive features that the work shall be of a commercial standard that has proven satisfactory in service, he found that to make an intelligent bid, a person would have to make a complete lay-out of the system. This was impossible because the diagrams did not carry information as to the way the circuits would run and how they should be run. A contractor would have to make a complete map of the city, would have to show the location of all fire alarm equipment, the circuiting of them, the construction details of how the boxes were to be mounted, how the connections were to be made and how the internal arrangements of the receiving equipment on each station should be arranged and connected. He would also have to spend much time in obtaining from local utility companies the proper clearances. He would have to spend time in the City Hall to find out whether or not they had the right to use certain equipment that belonged to the utility companies. He would have to ferret out the poles and duct lines that could be used and spend a lot of time going through a normal routine of motions that normally should be supplied as a part of the bidding documents.

He estimated that the work would take about forty man weeks. That means one man working for forty weeks. In view of the fact that the bidding document only gave one about fifteen to seventeen days, it would mean that one would have to work that down to a point where one would need a force of twenty men for two weeks or forty men for one week to perform the functions required by Paragraph Two of H, and that would be a terrific burden to place on a prospective bidder, and most of the contractors do not maintain an organization of such magnitude to comply with these requirements. It would mean he would have to hire a special firm of consultants to do this work, or if he couldn't hire such a firm, set up his own organization. It would cost a contractor "as much as $10,-000.00" to prepare this bid "which", he thought, "was a little unjust for public works". A consulting firm would charge between 45 and 50 thousand dollars. At the time the bids were called, it would have been impossible to assemble a crew and gotten the work done as there are not many men trained in this work. And you couldn't assemble them in so short a time. Time would be needed to communicate with manufacturers of fire alarm equipment which usually takes ten to twelve days, and also manufacturers of cable and duct equipment and other items necessary to install the system. The map that accompanied the specifications had spotted on it the location of the fire alarm boxes throughout the city. It did not have a location of the central fire alarm headquarters building to which the circuits were to run. He amplified:

"It had no location of the fire stations to which certain alarm systems were to be run. It means that a prospective bidder had to ferret out this information, and to do this, it meant he had to spend either considerable time at the City Office or he would have to spend considerable time riding the streets to find out where the fire stations were located. In order to intelligently re-route the new fire alarm circuits, this information is necessary. It is my opin-

ion that a contractor should not be required to furnish engineering information."

Edward A. Brass is a manufacturer engaged in the fire alarm manufacture and installation of signal systems in general since 1924. He testified that the items on the specifications which were manufactured by Electrical Storage Battery Company and incorporated in the Gamewell specifications would not be sold by them to other bidders. In general, he gave his view that some of the equipment is furnished by Gamewell and by no one else. To prepare an intelligent bid, you would have to come to spend two or three days in Phoenix and make a mental survey of the area to be protected and would have to make an area circuit assignment. One would have to make field notes and a map, and go to the telephone company and determine how many conduits were available, if the City would have rights of way in those conduits, and get a map from the telephone company showing the available conduits. It would take two men in the field, one an engineering manager, an estimator and draftsman from two and one-half to three weeks to reach the point of communicating with the telephone company and actually knowing where the conduits went. Then he would take the conduits and superimpose them on the map which had the circuit assignments and see where the voids existed between the telephone existing conduits and where he had to go to supply these areas for these circuits. Then he would go out and look over these areas and finally, by conferences between the field men and himself, he would have to lay a conduit from one street to another. Then all would have to be put in a work sheet and his field men would have to go out and measure up the amount of Class A and Class B paving. Then they would write what is called a cable specification. Then he would take the price of conduit ground rods, terminal boxes, and the various things that go into it, the number of feet of ditch, the paving and all those items, and set them up in tabu-lated form, put them together and that would be a bid with normal overhead and profit. Such work would take 704 man hours, either field engineering or office engineering, not including stenographic work. And that work could not have been prepared between the 17th day of June and the 5th day of July.

Walter N. Hershfield is a business man in Phoenix, Arizona, a wholesaler for various types of electronic equipment. He testified that when he saw the bids, he was impressed by the tremendous lack of information on the outside plant, and that it would be impossible to take the map accompanying the bid and determine exactly the amount of paving that must be broken up, the amount of wiring that must be overhead or be placed underground and determine "all the factors involved". And when he called the City Manager and the Fire Chief for additional information, he was given none.

From what precedes it is evident that there is ample testimony from which the court could infer that the specifications were incomplete in not furnishing the circuiting, the size and location of new cable, the length of sections of new cable, the location of available underground ducts, the location of fire stations or alarm headquarters.

In McQuillin on Municipal Corporations, 3 Ed., 1950, Vol. 10, Sec. 29.52, the following general summary of the requirements as to specifications is given:

"The specifications should be clear, definite and identical to all the bidders. Those relating to public improvements must be made sufficiently definite and certain that all may know what each is bidding upon, and that any bidder who secures the contract may be compelled to perform it in a way to produce the kind, character and grade of improvement desired so that liability upon his bond may result from his failure to do so. Specifically, bidders should be informed, by the advertisement or the specifications on file of (1) the quantity or amount of the work

or supplies, whenever it can be specified; (2) the time within which the work is to be finished or the supplies furnished; (3) the manner in which the work is to be done; (4) the quality of the materials, if any, to be furnished; and (5) any other matter necessary to enable bidders to bid intelligently."[3]

In the light of this, the specifications were not clear or definite, and, certainly, were not identical as to all the bidders. For Gamewell had information collated from the City Engineer over a period of three or four months by Ben Allen which the others did not have, and could not have secured within the time allowed for the bids, if at all. And many matters were missing which were necessary to bid intelligently.

We conclude that the court, in the light of testimony of this type, was right in holding the specifications restrictive and defective. It would unduly lengthen this opinion to ferret out every bit of additional testimony supporting this conclusion. In what precedes we have given, both in the form of general narrative and in the form of summaries and excerpts from the testimony of particular witnesses, the facts which support the lower court's conclusion.

It should be added that the facts as to Allen's activities were not denied. Several city employees testified to their nature and extent over a period of three or four months. There was testimony on the part of the appellant that the needed information was easily available and was of the type which a contractor in the field is *required* to secure in order to bid.

 The trial court was free to choose between these alternative versions and to "weigh more heavily for" the appellee. United States v. Yellow Cab Co., 1949, 338 U.S. 338, 342, 70 S.Ct. 177, 94 L.Ed 150. And as there is substantial evidence to support the version chosen, and the permissible inferences from documentary evidence and admitted facts, the requirements of Rule 52, Federal Rules of Civil Procedure are met. See, Bjornson v. Alaska S. S. Co., 9 Cir., 1951, 193 F.2d 433; Carr v. Yokohama Specie Bank, Ltd., 9 Cir., 1952, 200 F.2d 251, 255.

So the court was right in giving judgment against the appellant on its complaint.

## V

## The Counterclaim

 As to the counterclaim, we are of the view that the trial court erred in granting judgment to the City for the return of the amounts of the progress payments. While the authorities are not uniform, there is good authority to support the rule that where a contract is entered into between a municipality and another in good faith and the City has received benefits, it should not be allowed to retain them without paying the reasonable value of what it received. And this rule is applied even where it is held that recovery under the contract itself could not be had. McQuillin on Municipal Corporations, 3 Ed., 1950, Sec. 29.26, pp. 260–261; Sec. 29.112, pp. 259–260. Among the cases supporting this are Village of Pillager v. Hewitt, 1903, 98 Minn. 265, 107 N.W. 815; State ex rel. Hunt v. Fronzier, 1907, 77 Ohio St. 7, 82 N.E. 518; Vincennes Bridge Co. v. Board of County Commissioners, 8 Cir., 1917, 248 F. 93, 99–100; Ellefson v. Smith, 1924, 182 Wis. 398, 196 N.W. 834; Jones v. City of Centralia, 1930, 157 Wash. 194, 289 P. 3; Tobin v. Town Council of Town of City of Sundance, 1933, 45 Wyo. 219, 17 P.2d 666, 84 A.L.R. 902; Panhandle Construction Co. v. City of Spearman, Tex.Civ.App.1936, 89 S.W. 2d 1053, 1055; Boxwell v. Department of Highways, 1943, 203 La. 760, 14 So.2d 627, 631, and Smith v. Town of

---

3. The Supreme Court of Arizona in Berryhill Office Equipment Co. v. Phillips, 1929, 35 Ariz. 180, 276 P. 4, at page 7, quotes with approval the corresponding section from an earlier edition of this work: McQuillin on Municipal Corporations, 2 Ed., Sec. 1207.

Vinton, 1949, 216 La. 9, 43 So.2d 18, 21–22. (In the two Louisiana cases, contracts were let *without any compliance* with the requirement for competitive bidding.)

The *rationale* for the rule in these cases is well stated in Village of Pillager v. Hewitt, supra:

"The defendant in good faith received the money and bonds in payment of the bridge which he had built for the plaintiff. The consideration for such payment was full and fair, and, in equity and good conscience, it ought to have been made by the plaintiff. Such being the case, it would be most inequitable and unconscionable to compel the defendant to return the money and bonds paid to him under the circumstances found by the trial court, and we hold that the plaintiff cannot maintain this action to recover them." 107 N.W. at page 816.

The quotation just given shows the distinction between the cases just referred to and others, such as City of Bangor, Me. v. Ridley, 1918, 117 Me. 297, 104 A. 230; North Bergen Township v. Clinton Asphalt Co., 1933, 169 A. 818, 12 N.J.Misc. 22; Ryan v. Thomas, 1936, 47 Ariz. 91, 53 P.2d 863; City of Kiel v. Frank Shoe Mfg. Co., 1944, 245 Wis. 292, 14 N.W.2d 164, 152 A.L.R. 691, on which the City relies to sustain the judgment on the counterclaim. For in none of them was there a contract which the City *had the power* to enter into, but which was invalid merely because the prescribed *method* of entering into it had not been followed. On the contrary, each of them involved *ultra vires* contracts, illegal or fraudulent, of the type into which the

City could *not* enter into *under any circumstances*.[4]

In the case before us, the City had the power to contract for the extension of the fire alarm system. The invalidity of the contract stems merely from the fact that, in awarding it, *the requirement for competitive bidding was not complied with*. There has been part performance of the work and the City is not entitled to receive back the progress payments it made for the equipment delivered and the installations erected.

The portion of the judgment giving judgment against the appellant on its complaint is affirmed. The portion of the judgment giving judgment to the City in the sum of $287,123.52, and accrued interest on the counterclaim is reversed.

4. In City of Bangor, Me. v. Ridley, supra, a member of the City Council had been interested in a contract with the City contrary to the provision of a statute which declared such contracts void.

In North Bergen Township v. Clinton Asphalt Co., supra, the money was paid under circumstances which the court found collusive and fraudulent.

In Ryan v. Thomas, supra, a school board tried to pay out of school funds collected during one fiscal year for supplies sold during the preceding year when there was no surplus, a procedure forbidden by the yearly budget law.

In City of Kiel v. Frank Shoe Mfg. Co., supra, the City had paid funds and given benefits to a corporation in order to have it locate its plant within the city. The court held that, as the city was without power to do so, judgment in favor of the city for the money so paid was proper.