**DIXIE TANK & BRIDGE CO., a corporation, Appellant,**

v.

**COUNTY OF ORANGE, a county of the State of CALIFORNIA, and Willis H. Warner, Appellees.**

No. 15886.

United States Court of Appeals Ninth Circuit.

March 4, 1959.

Rehearing Denied April 8, 1959.

James C. R. McCall, Los Angeles, Cal., for appellant.

Joel E. Ogle, County Counsel, Stephen K. Tamura, Adrian Kuyper, Asst. County Counsel, County of Orange, Santa Ana, Cal., for appellee.

Before STEPHENS, CHAMBERS and BARNES, Circuit Judges.

CHAMBERS, Circuit Judge.

In late August, 1956, the 100,000 gallon water tank at the Orange County Hospital needed repairing in its rivets and its seams and needed repainting on its outside and relining with an asphalt preparation on the inside. Dixie Tank and Bridge Company specializes in doing just such work. It did the work. No contention is made that the work was not satisfactory, but the Board of Supervisors of Orange County now will not pay the sum of $7,511.60 (or any part of it) which Dixie claims is due it for the work which it completed November 21, 1956. The defense, on which the county has been sustained on a motion for judgment on the pleadings in this diversity case, is that the work was a single job in excess of $4,000 and that there were no real plans and specifications or advertising in newspapers for bids as required by the California statutes. Then a holding followed that the contract or contracts for the work were absolutely void and, further, that there is no recovery on quantum meruit. The decision was based on the district court's view of pertinent California cases.

A listing of the "paper work" backing up this "job" is desirable. Officials of the hospital, a county agency, sent one requisition to the county board of supervisors' purchasing agent. It is dated August 23, 1956, and lists the work to be done on the tank in eight items, estimates the price on the first item as $585 and the price for the other seven items in the one figure of $5,915, or a gross total of $6,500. Matching this requisition is a resolution on August 28, 1956, of the board of supervisors "authorizing the (county) purchasing agent to arrange for the repair of the high tank at the Orange County Hospital as requested by R. D. Powell, * * * Director. Estimated cost per requisition No. M2946A is $6,500."

Following this resolution, the purchasing agent issued a written invitation calling for bids. This went to five concerns. Bidders were to separately bid on five items such as exterior painting, interior scaling and painting. Then they were asked to give unit prices for filling pits, replacing rusted rivets, and welding deteriorated seams. (Obviously the total amount of work on the last three items could not be known until the inside of the tank was scaled—at which time the coun-

ty's inspector would ascertain how many units of the work had to be done.)

Dixie responded with an itemized bid for each of the five items certain. Also, in the same bid it listed unit prices for the three items uncertain as to quantity. The five definite items totaled $2,850.00. When finally ascertained, the price for the three items bid upon as units totaled $4,661.60.[1] (One other firm submitted a bid. It was much lower than Dixie's and it was withdrawn.)

Following receipt of the bid from Dixie, the board of supervisors met on October 2, 1956, and unanimously authorized the chairman to enter into a contract (form submitted) "for the cleaning, scaling and repairing, etc., the 100,000 gallon water tank at the Orange County Hospital." The chairman, Willis H. Warner, (named herein as a defendant in his individual capacity) signed the contract on that date, Dixie having previously signed it on September 21. This was the first of two contracts.

We note several features of the contract of October 2. First, it recites it was for emergency repairs. It actually only bound the contractor to do three things: 1. Scale the inside of the tank. 2. Apply asphalt to the inside. 3. Paint the outside. For this, a total price of $1,800 was required to be paid by the county. (The contract ignored the replacing of catwalks and tightening of loose sway rods upon which Dixie had made respective itemizations of $850.00 and $150.00 in its bid). As to the unit items, the contract said:

"After tank has been [cleaned and] inspected, company will submit a flat sum bid for all such repairs as may be necessary. This bid will be submitted to first party and a written repair contract embodying the specific work to be done, and the entire price to be paid shall be

entered into before any repair work is done."

The penultimate paragraph of the contract read:

"Parties signing this contract in behalf of First Party Covenant and agree that they are fully authorized and empowered to sign, seal, deliver and execute the same and that all legal requirements have been fully complied with."

It would seem that this paragraph referred to Chairman Warner personally when he signed the contract for the board (and the hospital) as chairman of the board of supervisors.

Three days later, October 5, the county's purchasing agent dispatched a purchase order to Dixie separately listing and ordering the five items for which Dixie had given fixed and definite prices and the three items for which unit prices had been submitted. This order recited, "as per agreement on file in county clerk's office." If the foregoing words referred to the "emergency contract" signed by Chairman Warner, then the order went beyond the contract.

Next in the chronology of papers is a "Standard Form of Contract for Emergency Repairs" dated November 7, 1956. On the same day, the board had authorized the expenditure of an "additional amount of $1,011.60 covering labor and material necessary to repair high water tank, 100,000 gallons, at the County Hospital." Also, the signing of this particular contract had been authorized by another motion of the same date. This contract of November 7 covered all of the items of refurbishing and repair on the tank, the amount of welding and riveting necessary having been ascertained after the scaling of the inside of the tank. Again, this agreement recited in the text that it was for "emergency repairs." Further, it provided that all

---

1. Dixie bid 60 cents per unit to weld rusted out rivets, $3.50 per lineal foot to weld deteriorated seams, and 60 cents per unit to weld all pits in tank. The inspection after scaling revealed no pits. However, 712 feet of welded seams at the bid price of $3.50 per foot at a total price of $2,492.00 and 3,616 new rivets at 60 cents each at a total price of $2,169.60 were required.

previous contracts were merged into it. All work, that to be done and that already done, was listed. No separate prices for items appear, but the single price of $7,511.60 was fixed. This figure would conform in total to Dixie's original bid, using its unit bid prices for welding and riveting, multiplying them by the now ascertained number of units required, and adding the result of such multiplication to the five items on which fixed prices had been offered in the bids.

Six days later, on November 13, the purchasing agent, followed through with a second purchase order to Dixie for "additional labor and material necessary to repair 100,000 gallon high tank, $1,011.-60." Thus, in all, we had a requisition from the hospital for $6,500 and a purchase order for $1,011.60, for a total of $7,511.50, resolutions of the board for the same total and a final contract for the same total.

It would appear that as soon as the work was done an issue arose as to whether the contract was void under California statutes because of failure to have adequate plans and specifications and failure to advertise in a newspaper for bids. In counties of population under 500,000, contracts involving over $4,000 require advertising for bids in a newspaper as a condition precedent to the signing.[2] Failure to comply makes the contract void. And the Supreme Court of California has been strict in holding void means void and has been unfriendly to quantum meruit.[3]

Dixie, seeking a way out of its legal box, sought refuge in fractions. It filed four claims with the board as follows:

1. A claim for $1,850.00 for three items covered by its first contract of October 2. There these items had the definite total price tag of $1,850.00.

2. A claim for $1,000.00 for the two items with definite prices bid (the replacement of catwalk plates and tightening of rods) which were not in the contract of October 2, but were in the purchase order of October 5.

3. A claim for $4,661.60 for the welding and riveting, the final price which had not been fixed until after the cleaning and inspection, and which sum by calculation only turns up as a fixed amount in the contract of November 7, the all inclusive contract.

2. Sections 25450 and 25451 and 25452 of the West's Ann.California Government Code provide:

"§ 25450. Contract for construction or repairs exceeding $4,000

"Whenever the estimated cost of construction of any wharf, chute, or other shipping facility, or of any hospital, almshouse, courthouse, jail, historical museum, aquarium, county free library building, branch library building, art gallery, art institute, exposition building, stadium, coliseum, sports arena or sports pavilion or other building for holding sports events, athletic contests, contests of skill, exhibitions, spectacles and other public meetings, or other public buildings or the cost of any repairs thereto exceeds the sum of four thousand dollars ($4,000), inclusive of the estimated cost of materials or supplies to be furnished pursuant to Section 25457, the work shall be done by contract. Any such contract not let pursuant to this article is void."

"§ 25451. Plans and specifications

"The board of supervisors shall adopt plans, specifications, strain sheets, and working details for the work."

"§ 25452. Advertisement for bids; requisite of publication

"The board shall cause an advertisement for bids for the performance of the work to be published for at least 10 consecutive times in a daily newspaper, or for at least two consecutive times in a weekly newspaper, of general circulation published in the county. If there is no such newspaper published in the county, the notice shall be given by posting in three public places for at least two weeks."

Comment: Any doubt that a tank is a building is removed by the California case of Miller v. McKinnon cited infra.

3. For a more charitable state view toward failure to comply with bidding statutes see Gamewell v. City of Phoenix, 9 Cir., 216 F.2d 928; Id., 9 Cir., 219 F. 2d 180, and Greenlee County v. Webster, 30 Ariz. 245, 246 P. 543.

4. An all inclusive claim for $7,511.60, the total amount of the contract of November 7 or the total amount of claims (1), (2) and (3) above.

All of the claims were rejected by the board on May 28, 1957, and this action was filed on July 22, 1957.

On a second amended complaint which set forth in great detail the facts hereinabove detailed (which had been required by the district judge when he ruled on the sufficiency of the first amended complaint) judgment was entered in favor of the defendants on a motion for judgment on the pleadings. As to Orange County, the trial court relied on Miller v. McKinnon, 20 Cal.2d 83, 124 P.2d 34, 140 A.L.R. 570, and County of San Diego v. California Water & Telephone Company, 30 Cal.2d 817, 186 P.2d 124, 175 A.L.R. 747. As to the separately stated claim, against Chairman Warner individually, the district court gives no reason for its decision and cites no applicable authority. However, the defense counsel had cited 4 McQuillin on Municipal Corporations 163, Section 12.214.

We take a somewhat different view of the situation. This requires a reversal.

█ First, while no really applicable California law has been cited or found, it is difficult to see just why Chairman Warner, who twice "covenant[ed] and agree[d]" that he "was fully authorized to sign, execute and deliver the same, and that all legal requirements have been fully complied with" should escape, if the county's contentions as to it are good and no recovery can be had against it. Dixie is a tank company. It repairs tanks. The board of supervisors is charged with running the county according "to the book." No doubt Dixie has had trouble elsewhere when pay day came about local legal requirements. So it has chosen to throw this responsibility on the local authority in an individual capacity when it can get a local citizen willing to take it. Chairman Warner didn't have to sign any contract[4] with the "warranty" he gave. So we think that there was at the very least a genuine issue of fact as to whether he was liable. Perhaps, as a matter of law, he was liable if his "warranty" was incorrect in its assumptions as to legality.[5]

4. The contract of November 7 recited that it was made "by and between authorized agent County of Orange Hospital Purchasing Department * * *" Warner signed: "Willis H. Warner, Chairman, Orange County Board of Supervisors." It is clear that except as to his warranty he was signing for Orange County.

5. All through the cases runs the statement: "Officers are not personally liable on contracts entered into by them acting in their official capacity unless the contract shows that the officer clearly intended to assume personal liability." See Bowden v. Eubanks, 57 Ga.App. 414, 195 S.E. 582, 584; Lawrence v. Toothaker, 75 N.H. 148, 71 A. 534, 23 L.R.A.,N.S., 428; Murphy v. Panther Oil & Grease Mfg. Co., 181 Miss. 882, 883, 179 So. 879; Sims Printing Co. v. Kerby, 56 Ariz. 130, 106 P.2d 197; Hupe v. Sommer, 88 Kan. 561, 129 P. 136, 43 L.R.A.,N.S., 565; New York & Charleston Steamship Co. v. Harbison, C.C., 16 F. 688; Rogers v. French, 214 Mass. 337, 101 N.E. 988; Coberly v. Gainer, 69 W.Va. 699, 72 S.E. 790.

Practically none of the cases end up with liability on the part of the public official, but there seems to be no report-

ed case where the text of the obligation points so strongly to an undertaking to be liable as the words in these contracts above Mr. Warner's signature.

One may wonder if Warner's undertaking could be held to be against public policy. The only case considering this particular point seems to be Lapsley v. McKinstry, 1866, 38 Mo. 245, 246. Therein it is said:

"In cases of officers acting for and on behalf of the government, the general rule is, that they are not bound personally by contracts made in an official capacity even though they would be by the terms of the contract, if it were an agency of a private nature—Sto. Agency § 302. This rule is established from motives of public policy. But although this is the general rule in relation to public agents, yet it is founded upon a mere presumption, and is liable to be rebutted by circumstances which clearly establish an intention between the parties to the contract to create and rely upon a personal responsibility on the part of a public agent; for there is nothing in the general prin-

■ And, we are not in agreement as to the disposition made otherwise by the district court. The contracts recite that the repair was an emergency. The resolution of November 7 recites there was an emergency. It would appear to us that there was a question of fact as to whether a great emergency existed on October 2, the date of the first contract, or on November 7,[6] the date of the second contract. Maybe the facts would establish this or maybe the facts would make this point evaporate. See Government § 25458, West's Ann. California Code.[7]

Also, if one should conclude that the contract of November 7 was void as to the county, where does that leave the contract of October 2? That was a definite self-sufficient contract for $1,850. It contemplated the submission of an additional bid for the rivets and welding, and a new contract being let therefor. It prohibited welding and riveting without a further contract therefor. This would seem to vitiate that part of the purchasing agent's order on October 5 for welding and rivets. But did it vitiate that part of the purchasing agent's order which covered the replacing of the catwalk plates and the tightening of the rods for a total price of $1,000.00, and which was not included in the contract of October 2?

Also, Section 25450.5 [8] of the West's Ann. California Government Code must be taken into account. It prohibits splitting of contracts in counties with more than (larger than Orange County in 1956 [9]) a specified population, if the purpose is to avoid the limitation as to advertising for bids. It must be a corol-

---

ciples or policy of the law which forbids an agent from waiving his official immunity, and making himself personally responsible. Id. § 306 "

While the foregoing case is old and may have been written with a quill or an early metal pen, still its logic is compelling. It appeals to us and we believe it would appeal to the California courts.

6. The record does not indicate whether the water system was a self contained unit with its own well or whether the system was connected to an outside source. We cannot say on the record that an emergency existed, but we presume that any urgency would be mainly related to fire hazard at the hospital or the necessity of a reserve supply if the source were temporarily lost.

It is quite conceivable that no emergency existed until Dixie finished scaling the inside of the tank under the first contract. However, whether the welding and riveting work could be treated as a great emergency would be a question of fact.

It does appear that at one time after the work was done, the board itself suggested that Dixie could be paid according to the emergency formula which is a cost plus basis.

7. West's Ann.Cal.Government Code § 25458, in 1956, read as follows:

"Repair or replacement of structures in emergency; cost-plus contract

"By the unanimous consent of the whole board in cases of great emergency, it may proceed at once to replace or repair any and all structures without adopting the plans, specifications, strain sheets, or working details or giving notice for bids to let contract. The work may be done by day labor under the direction of the board, by contract, or by a combination of the two. If the work is done wholly or in part by contract, the contractor shall be paid the actual cost of material and labor expended by him in doing the work, plus not more than 15 per cent to cover all profits, supervision, use of machinery and tools, and other expenses. No more than the lowest current market prices shall be paid for materials."

8. The West's Ann.Cal.Government Code, No. 25450.5 provides as follows:

"Splitting work under contracts to avoid statute prohibited

"In any county containing a population of 500,000 or over, it is unlawful to split or separate into smaller work orders or projects any public work project for the purpose of evading the provisions of this article requiring public work to be done by contract after competitive bidding. Every person who wilfully violates the provisions of this section is guilty of a misdemeanor."

Apparently this section first appeared in California in 1947. See Cal.Stats. 1947, c. 857, § 2. Most of the California cases on advertising for bids antedate 1947.

9. The official population of Orange County in 1956 was 216,224. West's Ann.Cal. Government Code, § 28020.

744

lary that such splitting is not legally so bad in counties the size of Orange. It is difficult to see how the county could be held on the two items of $2,492.00 for welding and $2,169.60 for rivets for a total of $4,661.60 unless an emergency can be sustained. However, emergency or not, the issue would seem to be one of fact.

The judgment is reversed for further proceedings consistent with this opinion.